# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-IA-00790-SCT

*SANDERSON FARMS, INC.*

*v.*

*ROY R. GATLIN AND NELDA T. GATLIN*

| | |
|---|---|
| DATE OF JUDGMENT: | 9/26/2000 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | RICHARD O. BURSON |
| | BROOKE FERRIS |
| | RICHARD A. FOLLIS |
| ATTORNEYS FOR APPELLEES: | LAWRENCE E. ABERNATHY, III |
| | JOHN DUDLEY BUTLER |
| | MICHAEL J. QUIRK |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED AND REMANDED- 06/26/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**McRAE, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     In this permissive interlocutory appeal, Sanderson Farms, Inc. (Sanderson Farms) seeks review of an order of the Circuit Court of Jones County, Mississippi denying its motion to dismiss and motion to reconsider.  Sanderson Farms asserts that the circuit court erred in refusing to dismiss the complaint of Roy R. and Nelda T. Gatlin who by executed contract agreed to binding arbitration of any disputes or controversies relating to or arising out of a Broiler Production Agreement executed January 1, 1997.  The circuit court found that Sanderson Farms had breached the arbitration provision and thereby waived its protections

and that the arbitration provision was unconscionable and unenforceable. We find that the circuit court did not err, affirm the order denying the motion to dismiss and motion to reconsider, and remand this case for further proceedings.

**FACTS**

¶2. Roy R. Gatlin (Roy) first contracted with Sanderson Farms to grow chickens for the company in November of 1980. Pursuant to contract, Sanderson Farms would deliver chickens to Roy's farm, and Roy would raise the chickens to maturity. Roy's original contract with Sanderson Farms contained no provision regarding arbitration. Roy was ranked in the top 50% of the company's growers and was authorized by Sanderson Farms to build two (2) additional broiler houses. Roy and Nelda Gatlin (Nelda) pledged their farm, which included their home and four (4) broiler houses, as security on a mortgage of over $250,000, to secure the necessary money to pay for the two (2) additional broiler houses.

¶3. In 1996, Roy joined the Mississippi Contract Poultry Growers Association (Mississippi Poultry Growers). During this time, the Mississippi Poultry Growers and Sanderson Farms were engaged in discussions and negotiations concerning proposed changes to the broiler contract, which was mandated for each grower who participated in Sanderson Farms broiler growing program. Correspondence between the Mississippi Poultry Growers and Sanderson Farms evidence the apprehension that poultry growers in Mississippi had with Sanderson Farms' proposed broiler contract which included an arbitration provision.

¶4. In January of 1997, Sanderson Farms presented a new fifteen (15) year contract to Roy. Only Roy signed the new contract. The new Broiler Production Agreement (broiler

2

contract) contained a mandatory arbitration clause.  The arbitration provision appeared on

the sixth  page of the eight-page contract buried in section twenty-seven and in no more than

font size nine (9) as illustrated below.[1]  The bold face type was added by this Court to

emphasize the phrases of the provision which are primarily at issue in this appeal.  The

arbitration provision provided that:

> 27.  **ARBITRATION**.  Any controversy or claim arising between the parties . . ., including but not limited to, disputes relating to this Agreement, the arbitrability of any dispute relating to this Agreement, or of any breach of this Agreement, whether such controversy or claim arises before, during or after termination of this Agreement, will be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association by a panel of three arbitrators.  The Agreement to arbitrate will continue in full force and effect despite expiration, recission, or termination of this Agreement.  By entering into this Agreement, the parties waive the right to have any dispute arising between them tried and adjudicated by a court of law.  Without inconsistency with this agreement to arbitrate, either party may seek from a court any provisional remedy that may be necessary to prevent irreparable harm, pending the establishment of the arbitral panel or its determination of the merits of the controversy.  Risk of loss of all or part of the Flock will be deemed irreparable harm.  The seeking of any provisional remedy by either party shall be supplemental to, and not in place of, Sanderson's contractual right to repossess a Flock pursuant to Section 24.
>
> **Upon objection by any party, multi-party arbitration shall not be utilized**.  **The parties herein agree to resolve all disputes by such arbitration using the American Arbitration Association office with the closet geographic proximity to Sanderson's local complex**.  **The arbitration will take place at a location mutually agreed to by the parties**.  In reaching their conclusions, the arbitrators will apply to this Agreement the law which a Mississippi court would apply.  **The arbitration will have the authority to award actual money damages as provided in Section 15 (with interest on unpaid amounts from the date due), specific performance, and temporary injunctive relief, but the arbitrators shall not have the authority to award exemplary or punitive damages, and the parties expressly waive any claimed right to such damages**.  Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.  **The cost of such arbitration will be divided equally among the parties to the arbitration.  Each party will bear the costs of their own expenses and attorney's fees.  Failure to arbitrate all such claims or controversies arising under or related to this Agreement shall be deemed a breach of the Agreement**.  Notwithstanding anything to the contrary, either party may terminate the Agreement prior to or without arbitration in accordance with Sections 22, 23, 24, 25.

(emphasis added). "Cost" is not defined in the broiler contract.  Additionally, on page eight

(8) in no more than font ten (10) as illustrated below, above the signatures of the parties, the

broiler contract states:

> **THE UNDERSIGNED DOES HEREBY DECLARE THAT THE TERMS OF THIS AGREEMENT HAVE BEEN COMPLETELY READ AND FULLY UNDERSTOOD.  THIS AGREEMENT CONTAINS ARBITRATION LANGUAGE WHICH IS BINDING.**

---

[1]  There has been some dispute as to whether the font size illustrated in the record has been adjusted and reduced in size for production to this Court.  Since the font size of the Broiler Production Agreement is immaterial and irrelevant to our holding, we need not clarify the issue.

(emphasis in original). Sanderson Farms required Roy to accept the new contract containing the arbitration clause in order to keep doing business with the company. Roy, who was $250,000 in debt at the time, signed the contract. Everything ran smoothly for a year until December of 1997 when Roy heard rumors that Sanderson Farms was going to try to terminate his contract.

¶5. On Christmas Day, 1997, Sanderson Farms called Roy and told him to come into its office the next day. Sanderson Farms terminated its contract with Roy on December 26, 1997, to be effective January 1, 1998. There were still fourteen years remaining on the contract. Sanderson Farms' termination letter stated that termination came as the result of Roy's violation of section 23(c) of the contract which allowed termination if Roy " fails to comply with applicable federal, state or local laws or regulations." Sanderson Farms justified the termination by asserting that Roy had committed one violation of Mississippi Board of Animal Health, Regulation 13(V) which addresses disposal of dead poultry. This alleged violation later was found out to be untrue, and it was discovered that Roy had readily passed the Board of Animal Health's inspection. In fact, no complaint was ever filed and no adjudication of guilt was ever had against Roy for the alleged violation which Sanderson Farms argues supports the broiler contract termination.

¶6. Upon termination, Sanderson Farms took Roy's most recent shipment of chickens and sent them to another grower. Roy immediately contacted every poultry processing company in the area, but all refused to deliver chickens to him.

¶7. In February 1998, Roy filed a demand for arbitration against Sanderson Farms based on the company's termination of the contract. To initiate the arbitration, Roy paid the initial

4

administrative fee of $2,000. Roy and Sanderson Farms then participated in mediation which led to no resolution of the matter but cost Roy an additional $750. In total, Roy paid $2,750. Pursuant to the arbitration provision in the contract, Roy called upon Sanderson Farms to split the expenses of the arbitration. The pertinent provision states:

> The cost of such arbitration will be divided equally among the parties to the arbitration. Each party will bear the costs of their own expenses and attorney's fees.

Upon receiving the demand, Sanderson Farms claimed that the sentence reading "[e]ach party will bear the costs of their own expenses" means that Roy must bear the costs of the initial filing fees. Sanderson Farms claims that the sentence "[t]he cost of such arbitration will be divided equally among the parties" only means that the actual costs of arbitration will be divided equally among the parties.

¶8. Then in 1999, prior to any hearing, Roy was informed that he owed an additional $8,250 in arbitrator's compensation, expenses to be reimbursed to arbitrator, administrative fee for hearing, and miscellaneous expenses. The $8,250 charge was only an estimate. More fees could be charged once the arbitration proceeding began. Additionally, the $8,250 charge was to be paid up front before arbitration will even be initiated. However, the record does not indicate whether the $8,250 charge was Roy's half of the arbitration costs or whether that was the total of the arbitration costs. Since prior to the issuance of the bill for the additional $8,250 charge, the American Arbitration Association had been notified by Sanderson Farms and informed that it would be paying "one-half (½) of the cost of the arbitration itself, including arbitrator compensation and expenses, reporting service cost, hearing fees and, if necessary hearing room rental," it can only be assumed that the bill

issued to Roy for the additional $8,250 represented his one-half (½) of the additional arbitration costs.

¶9.     In September of 1999, after receiving Sanderson Farms' letter refusing to split the fees, Roy and Nelda filed this suit in the Circuit Court of Jones County, Mississippi. Their complaint alleged intentional infliction of emotional distress and willful and intentional breach of contract in arbitrarily terminating the broiler contract and in refusing to pay arbitration fees in accordance with the broiler contract.  The complaint sought compensatory damages, attorneys fees, simple tort damages, and punitive damages.  The filing fee in Jones County cost Roy and Nelda $94.00.

¶10.    Sanderson Farms filed a motion to dismiss arguing that Roy had signed a broiler contract wherein he agreed to binding arbitration and that the circuit court should dismiss the action as arbitration is the proper forum for any disputes between the two.  In their response to the motion to dismiss the Gatlins argued that Sanderson Farms had breached the contract and waived any right to submit the dispute to arbitration by refusing to pay the required fees under the arbitration agreement.  Sanderson Farms filed a rebuttal memorandum claiming that Nelda had no actionable claim since she had no contractual relationship with the company and arguing that it had not breached the arbitration agreement or waived its right to arbitration. Roy and Nelda's rebuttal memorandum argued that the initial filing fees and up front costs required for arbitration were indeed costs of arbitration under the contract language, and that Sanderson Farms' refusal to pay its one-half share was a breach of the arbitration provision which constituted a waiver of any right to arbitrate.

6

¶11. Two separate evidentiary hearings were held in the circuit court. Roy and Nelda presented the circuit court with a letter confirming that they indeed had initiated arbitration and paid up front fees totaling $2,750. They also presented a letter from Sanderson Farms to the Supervisor of Case Administration for the American Arbitration Association which denies that by agreement Sanderson Farms is required to split the initial arbitration fees. Sanderson Farms' letter dated March 10, 1998, states in pertinent part:

> I am in receipt of your letter dated March 3, 1998 regarding the $750.00 outstanding for the filing fee in this dispute. This will advise that contrary to what Mr. Butler [Roy and Nelda's Attorney] may have told you in your telephone conversation, the contract at issue does not provide that a non-filing party is responsible for paying one-half (½) of the filing fee. The contract provides that "the cost of . . . arbitration will be divided equally among the parties to the arbitration. Each party will bear the cost of their own expenses and attorneys' fees." **It is Sanderson Farms' position that the "cost of arbitration" was never intended to include the filing fee for initiation of proceedings. The filing fee is Mr. Gatlin's expense which the contract requires he bear**. . . .
>
> Sanderson Farms intends to pay one-half (½) of the cost of the arbitration itself, including arbitrator compensation and expenses, reporting service costs, hearing fees and, if necessary, hearing room rental. However, the contract at issue does not require Sanderson Farms to finance the filing of a claim against it. Therefore, it is Mr. Gatlin who is responsible for paying the outstanding balance of $750.00.

(emphasis added). At the second hearing, Roy and Nelda asserted that they would be willing to go ahead with arbitration if the circuit court would appoint or pick the arbitrator. In so many words, Sanderson Farms rejected this suggestion and asserted that arbitration should be conducted as provided for in the contract.

¶12. The circuit court entered an order denying Sanderson Farms' motion to dismiss. The circuit court found that Sanderson Farms was indeed by contract obligated to pay one-half of the filing and initial fees for arbitration and that its refusal to do so was a breach of the

7

agreement which constituted a waiver of any right to arbitration. Sanderson Farms immediately filed a motion to reconsider or, in the alternative, to amend order to grant certification for interlocutory appeal and a motion to stay. The circuit court denied both motions. Since the alleged breach by Sanderson Farms in 1998, Roy and Nelda have been waiting five years for a hearing on this matter.

¶13. On May 12, 2000, Sanderson Farms filed with this Court a petition for interlocutory appeal. On September 26, 2000, the Panel of Banks, P.J., and Smith and Mills, JJ. granted Sanderson Farms permission to proceed with this interlocutory appeal and stayed proceedings below. *See* M.R.A.P. 5. Sanderson Farms presents the issue as whether the circuit court erred in denying its motion to dismiss and motion to reconsider. Since the issues which properly address the circuit court's findings are broader, this Court will identify the areas upon which the circuit court rests its ruling: specifically whether a breach constituted waiver of the protections of the arbitration provision; whether the arbitration provision is unconscionable; and whether portions of the arbitration provision may be severed.[2]

## DISCUSSION

¶14. Oddly enough, Sanderson Farms did not file a motion to compel in the circuit court. However, in its motion to dismiss for failure to state a claim, it essentially asserted that

---

[2] This Court does have the authority to review issues broadly to effectuate its complete holding on an issue. In **Dillard**, we were called upon to examine whether the trial court erred in dismissing the action based on lack of standing to bring suit. **Dillard v. Musgrove,** 838 So.2d 261, 263 (Miss. 2003). The trial court did not address the merits. Not only did this Court affirm the trial court's dismissal, but we went a step further and ruled that the SLRP Retirement Fund for the Legislators was constitutional even though this issue was never considered by the trial judge. **Id.** at 264-66.

"federal law mandates that this Court enforce the arbitration provisions of the Broiler Production Agreement and compel Plaintiffs to submit their disputes to binding arbitration." So essentially, Sanderson Farms' motion to dismiss is in essence a motion to compel. In any event, this Court conducts de novo review on both motions to dismiss and the denial of motions to compel. *Poindexter v. Southern United Fire Ins. Co.*, 838 So.2d 964, 966-67 (Miss. 2003); *East Ford v. Taylor*, 826 So.2d 709, 713 (Miss. 2002) (citing *Webb v. Investacorp, Inc.*, 89 F.3d 252, 256 (5th Cir. 1996)).

¶15.    A two-prong inquiry is used when determining whether a motion to compel should be granted. The first prong has two components: (1) Whether there is a valid arbitration agreement; and (2) Whether the parties' dispute is within the scope of the arbitration agreement. *East Ford*, 826 So.2d at 713. Here the outcome of the first prong is undisputed.[3] The second prong concerns "whether legal constraints external to the parties' agreement foreclosed arbitration of those claims." *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). This second prong includes the consideration of applicable contract defenses available under state contract law which may invalidate the arbitration agreement. *Id.* (citing *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)).

---

[3] There is an argument that could be made concerning the application of the arbitration agreement to Nelda Gatlin. However, since counsel for Sanderson Farms during the hearing on the motion to reconsider conceded that the contract does not bind Nelda, there is no reason to go into details concerning this issue.

## I. DID THE CIRCUIT COURT ERR IN DENYING SANDERSON FARMS' MOTION TO DISMISS?

¶16. The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., provides that an agreement to submit any controversy to arbitration, where the underlying transaction involves interstate commerce, is enforceable subject only to any contract defense recognized under state law. The Federal Arbitration Act states, in relevant part, that:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, **save upon such grounds as exist at law or in equity for the revocation of any contract.**

9 U.S.C. § 2 (emphasis added). The FAA allows state courts to deny compulsion of arbitration upon a finding that law or equity demands revocation of the contract. "[S]tate law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforcability of contracts generally." *Perry v. Thomas*, 482 U.S. 483, 492, 107 S. Ct. 2520, 96 L. Ed. 2d 426 (1987). Furthermore, Section 3 of the FAA provides a "default exception" whereby an individual is precluded from seeking enforcement of an arbitration provision if that individual is "in default in proceeding with such arbitration." 9 U.S.C. § 3.

¶17. This Court in *East Ford*, summarized the policies of the FAA:

> The Federal Arbitration Act provides that arbitration agreements "shall be valid irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Act establishes a " 'federal policy favoring arbitration,' . . . requiring that 'we rigorously enforce agreements to arbitrate.' " *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987)

10

(citations omitted). "Absent a well-founded claim that an arbitration agreement resulted from the sort of fraud or excessive economic power that 'would provide grounds for the revocation of any contract,' the Arbitration Act 'provides no basis for disfavoring agreements to arbitrate statutory claims by skewing the otherwise hospitable inquiry into arbitrability.' " *Id.* (citations omitted). "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration . . . The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). This Court has adopted this preference for arbitration. See *Smith Barney, Inc. v. Henry*, 775 So.2d 722 (Miss. 2001); *I.P. Timberlands Operating Co. v. Denmiss Corp.*, 726 So.2d 96, 103-104 (Miss. 1998); *Hutto v. Jordan*, 204 Miss. 30, 36 So.2d 809, 812 (1948).

It has been recognized that in order to determine whether legal constraints exist which would preclude arbitration, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *Bank One, N.S. v. Coates*, 125 F.Supp.2d 819, 827 (S.D. Miss. 2001) (quoting *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257 (5th Cir. 1996)). However, "[c]ourts may not . . . invalidate arbitration agreements under state laws applicable only to arbitration provisions." *Doctor's Assocs., Inc. v. Casaroto*, 517 U.S. at 687, 116 S.Ct. at 1665 (quoting *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281, 115 S.Ct., 834, 843, 130 L.Ed.2d 753 (1995); *Perry v. Thomas*, 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 2527 n.9, 96 L.Ed.2d 426 (1987)). In other words, the usual defenses to a contract such as fraud, unconscionability, duress, and lack of consideration may be applied to invalidate an arbitration agreement, so long as the law under which the provision is invalidated is not applicable only to the arbitration provisions.

826 So.2d at 713-14.

## A. DID SANDERSON FARMS BREACH THE BROILER CONTRACT SPECIFICALLY THE ARBITRATION PROVISION?

¶18. Sanderson Farms argues that it did not breach the arbitration provision. It argues that

its interpretation of the cost splitting portion of the provision is correct. Sanderson Farms

asserts that its denial of payment of one-half the fees was not a breach of the arbitration

agreement. Roy argues that indeed Sanderson Farms did breach the arbitration provision; and therefore, it is not entitled to its protections.[4] The arbitration provision provided in pertinent part that:

> The **cost** of such arbitration will be divided among the parties to the arbitration. Each party will bear the cost of their own **expenses** and attorney's fees.

(emphasis added). The broiler contract does not define "cost" or "expenses." Sanderson Farms, the drafter of the broiler contract, had the opportunity to clarify the meaning of these terms but did not.

¶19. When terms in a contract are not defined, we "give the words in the document their commonly accepted meaning." *Parkerson v. Smith*, 817 So.2d 529, 541 (Miss. 2002). "Cost" is defined as "among or equivalent paid or charged for something; the outlay or expenditure (as of effort or sacrifice) made to achieve an object; loss or penalty incurred in gaining something; and expenses incurred in litigation." Webster's New Collegiate Dictionary 255 (1979). Also,"expense" is defined as "the act or practice of expending money; the act or process of using up; something expended to secure a benefit or bring about a result." *Id.* at 399. Under these definitions, the filing and administrative fees charged by the American Arbitration Association are "costs" which by contract Sanderson Farms agreed

---

[4] Sanderson Farms also argues that the circuit court and this Court lack authority to review the issues of breach, waiver, and unconscionability. It asserts that these issues are only proper before the arbitrator. Without addressing this issue in our discussion, we find that this argument is without merit. This Court has always had the authority to review the enforceability of contract provisions, including arbitration provisions. Such an argument is frivolous and flies in the face of this Court's equitable power. Furthermore, by statute, this Court is vested with the power to determine contract unconscionability and any assertion that such right is limited by the language of Sanderson Farms arbitration provision is contrary to law. Miss. Code Ann. § 75-2-302(1) (Rev. 2002).

to divide equally with Roy. Even applying the legal definitions to these terms leads to the same result. "Cost" is defined as "the amount paid or charged for something; price or expenditure." Black's Law Dictionary 282 (7th ed. 2000). "Expense" is defined as "an expenditure of money, time, labor, or resources to accomplish a result." *Id*. at 473. Administration fees and filing fees are encompassed in the definition of "cost" for which Sanderson Farms contracted to "divide equally among the parties." Additionally, if Sanderson Farms meant "cost" to include filing fees and administrative fees, then it could have specifically stated that in its contract. Furthermore, any ambiguity as to the definition of "cost" and "expense" are to be resolved in favor of Roy, since Sanderson Farms as the contracting party had the duty to make such terms unambiguous. *Miss. Transp. Comm'n v. Ronald Adams Contractor, Inc.*, 753 So.2d 1077, 1085 (Miss. 2000) (collecting authorities).

¶20. Sanderson Farms argues that what it meant by "cost" was actual costs of arbitration; specifically the arbitrator's compensation and expenses, reporting service costs, and hearing fees. We have repeatedly stated that "our concern is not nearly so much what the parties may have intended as it is what they said, for the words employed are by far the best resource for ascertaining intent and assigning meaning with fairness and accuracy." *IP Timberlands Operating Co. v. Denmiss Corp.*, 726 So.2d 96, 104 (Miss. 1998) (quoting *Whittington v. Whittington*, 608 So.2d 1274, 1278 (Miss. 1992); *UHS-Qualicare v. Gulf Coast Cmty. Hosp., Inc.*, 525 So.2d 746, 754 (Miss. 1987)). Since we are not concerned with what Sanderson Farms may have meant, but didn't say, we find this argument has no merit.

13

¶21. By refusing to pay one-half of the $2,750 cost which amounted to filing and administrative fees and/or the $8,250 cost of arbitration fees and compensation, Sanderson Farms breached the arbitration provision. Sanderson Farms' breach can be used to support the defense of waiver as will be discussed below.

**B. IF SANDERSON FARMS DID IN FACT BREACH THE ARBITRATION PROVISION, THEN DID IT WAIVE ITS RIGHT TO ARBITRATION?**

¶22. Sanderson Farms argues that it at no time waived its right to arbitrate. It argues that since it did not breach the arbitration provision, it can not be found to have waived its right to arbitration. Roy argues that Sanderson Farms' breach of the arbitration provision supports a finding of waiver. He argues that since Sanderson Farms waived its right to arbitrate, it is not entitled to the provision's protection.

¶23. We recognize that there are strong federal policies in favor of arbitration and that waiver is not a favored finding. *Russell v. Performance Toyota, Inc.*, 826 So.2d 719, 724 (Miss. 2002) (collecting authorities). However, it is simple contract law that a party may waive the protections of any provision of a contract. "[A] party to a contract may by words or conduct waive a right to which he would otherwise have been entitled" *Scott Addison Constr., Inc. v. Lauderdale County Sch. Sys.*, 789 So.2d 771, 775 (Miss. 2001) (quoting *Canizaro v. Mobile Communications Corp.*, 655 So.2d 25, 29 (Miss. 1995) (citations omitted)). "[W]aiver may be express or it may be implied when the party actively participates in litigation or acts inconsistently with its rights to proceed with arbitration." *Siam Feather & Forest Prods. Co. v. Midwest Feather Co.*, 503 F. Supp. 239, 242 (S.D. Ohio 1980) (citing *American Locomotive Co. v. Gyro Process Co.*, 185 F.2d 316 (6th Cir.

14

1950), *aff'd mem.* 663 F.2d 1073 (6th Cir. 1981)). *See Cornell & Co. v. Barber & Ross Co.*, 360 F.2d 512, 513 (D.C. Cir. 1966); *Cox v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 619 So.2d 908, 914 (Miss. 1993). [5] "[W]aiver may be inferred from the actions and conduct of the parties." *Brent Towing Co., Inc. v. Scott Petroleum Corp.*, 735 So.2d 355, 359 (Miss. 1999) (quoting *Mariana v. Hennington*, 229 Miss. 212, 226, 90 So.2d 356, 362 (1956)).

¶24.    Sanderson Farms waived its right to arbitration by refusing to pay its one-half of the costs associated with filing and administrative fees and/or the additional charges presented for payment one month before the scheduled arbitration hearing.  This refusal amounts to an act inconsistent with the right to arbitrate.  By waiving its right to arbitrate, Sanderson Farms has relinquished the right to seek the protections of the arbitration provision in the broiler contract.

¶25.    Furthermore, the FAA itself provides that a party in default essentially waives his right or is precluded from invoking the arbitration agreement.  Section 3 of the FAA provides that a party may compel arbitration and stay trial court proceedings if he "is not in default

---

[5] This Court discussed waiver of arbitration provisions in *Russell v. Performance Toyota, Inc.*, 826 So.2d 719, 723-24 (Miss. 2002), where we found no waiver where a car dealership initiated self help repossession without any legal action.

This Court in *University Nursing Assocs., PLLC v. Phillips*, 842 So.2d 1270 (Miss. 2003), found no waiver where the party seeking to invoke arbitration had filed a response to the complaint and objected to discovery requests.

This Court discussed waiver in *Scott Addison Construction, Inc. v. Lauderdale County School System*, 789 So.2d 771 (Miss. 2001), wherein we found that an a contractor waived his right to object to the deletion of an arbitration provision from a contract after a dispute arose.

This Court in *Brent Towing Co. v. Scott Petroleum Corp.*, 735 So.2d 355 (Miss. 1999), found that a vendor's acceptance of a late payment waived his right to claim breach of the contract resulting from that late payment.

As evidenced by these four (4) cases, this Court has never faced a situation such as this where one party refuses to abide by the contract language and pay its share of the arbitration costs.

in proceeding with such arbitration." 9 U.S.C. § 3. As discussed above, Sanderson Farms breached the arbitration agreement and is thereby in default. So even under the FAA's own rules, Sanderson Farms is precluded from seeking the protections of the provision.

### C.   IS THE ARBITRATION PROVISION AT ISSUE PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE?

¶26.   Since we have already found Sanderson Farms in default under the arbitration provision and further found such default to support the defense of waiver, we need not address this issue.

### D.   IF PORTIONS OF THE ARBITRATION PROVISION HAVE BEEN WAIVED BY SANDERSON FARMS, THEN MAY THOSE PORTIONS BE SEVERED FROM THE PROVISION?

¶27.   Sanderson Farms argues that if this Court finds portions of the arbitration provision unenforceable due to unconscionability or waiver, then those portions should be severed from the provision and the rest of the arbitration provision or the broiler contract should be allowed to stand. Since we have already found that Sanderson Farms breached the arbitration agreement and thereby waived its protections, the only just outcome is to strike the entire arbitration agreement from the contract. We do however add that not only did Sanderson Farms default and waive the application of the arbitration provision, but also other provisions which are referenced therein which assert to limit damages.

### CONCLUSION

¶28.   By failing to pay its half of the required arbitration fees under the broiler contract, Sanderson Farms has breached the arbitration provision and therefore waived its right to compel its protections. The circuit court did not err in denying Sanderson Farms' motion to

16

dismiss ands its motion to reconsider. Having found the learned trial judge to be correct, his ruling is hereby affirmed, and this case is remanded for further proceedings consistent with this opinion.

¶29. **AFFIRMED AND REMANDED.**

**DIAZ, EASLEY AND GRAVES, JJ., CONCUR. PITTMAN, C.J., AND WALLER, J., CONCUR IN RESULT ONLY. COBB, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, P.J. AND CARLSON, J.**

**COBB, JUSTICE, DISSENTING:**

¶30. The Gatlins' complaint sought compensatory and punitive damages for breach of contract and other claims relating to Sanderson Farms' termination of their Broiler Production Agreement (the Agreement). Sanderson Farms moved to dismiss and compel arbitration. The trial court denied the motion, holding that by refusing to pay a one-half share of the arbitration filing fees, Sanderson Farms breached its contract with Mr. Gatlin,[6] so that Sanderson Farms can no longer compel arbitration.

¶31. On interlocutory appeal, Sanderson Farms argued that the trial court erred by holding that Sanderson Farms waived its right to compel arbitration. On cross appeal, the Gatlins argued that the arbitration clause was unconscionable and thus unenforceable.

¶32. Based on the law, both federal and state, and the facts before this Court, I believe that the amount Mr. Gatlin was billed, before his arbitration hearing, was so exorbitant as to effectively deny him any legal recourse, and thus was unconscionable. However, because

---

[6]Only Mr. Gatlin signed the Broiler Production Agreement containing the arbitration clause with Sanderson Farms. Only Mr. Gatlin commenced the arbitration process. However, both Mr. and Mrs. Gatlin were named as plaintiffs in the civil complaint against Sanderson Farms. Thus, when referring to the Agreement and the arbitration process, "Mr. Gatlin" will be used; when referring to the civil action, "the Gatlins" will be used.

17

the record is not developed sufficiently to determine whether Mr. Gatlin was indeed required to pay that amount, I would remand for further proceedings so that this determination may be made by the trial court. Because the possibility exists that Mr. Gatlin may not be required to pay the unconscionable fee, I believe it is necessary to consider his arguments regarding the unconscionability of waiving a possible award of punitive damages and the alleged waiver by Sanderson Farms of its right to arbitrate. The plurality fails to recognize, however, that the law in other state courts and the federal courts clearly states that these issues are properly considered **by the arbitrator, not by the court.**

¶33.   As the plurality points out, Mr. Gatlin had been involved in the business of growing chickens for Sanderson Farms some seventeen years prior to the time when he signed the Agreement which is the subject of this case. As a member of the Mississippi Contract Poultry Growers Association, Mr. Gatlin was well aware of discussions and negotiations concerning the changes to the Agreement, including the addition of a mandatory arbitration clause. Although the plurality places much emphasis on the fact that the arbitration clause did not appear until paragraph 27 of the contract, there is no question that Mr. Gatlin knew about it and understood its ramifications when he signed the Agreement on January 1, 1997. The relevant portions of that contract are excerpted below:

## BROILER PRODUCTION AGREEMENT

23.   **IMMEDIATE TERMINATION**.   This Agreement may be immediately terminated by Sanderson at any time upon written notice for any of the following reasons:
. . . .

18

i.The Grower fails to comply with applicable federal, state, or local laws or regulations . . . .

. . . .

27.   **ARBITRATION**.  **Any controversy or claim arising between the parties** (and not resolved pursuant to Paragraph 27[7] above), **including but not limited to, disputes relating to this Agreement, the arbitrability of any dispute relating to this Agreement , or of any breach of this Agreement, will be settled by binding arbitration** in accordance with the Commercial Arbitration Rules of the American Arbitration Association by a panel of three arbitrators. . . . **By entering into this Agreement, the parties waive the right to have any dispute arising between them tried and adjudicated by a court of law.**
. . .

Upon objection by any party, multi-party arbitration shall not be utilized. . . . The arbitrators will have the authority to award actual money damages . . . , specific performance, and temporary injunctive relief, but the arbitrators shall not have the authority to award exemplary or punitive damages, and the parties expressly waive any claimed right to such damages. . . . **The cost of such arbitration will be divided equally among the parties to the arbitration.  Each party will bear the cost of their own expenses and attorneys' fees.  Failure to arbitrate all such claims or controversies arising under or related to this Agreement shall be deemed a breach of the Agreement**.
. . .

The parties agree that this Agreement "involves commerce" as that term is used in the Federal Arbitration Act, 9 U.S.C. § 1 et seq.

(emphasis added).

¶34.   On the last page of the contract, where Mr. Gatlin and Sanderson Farms signed, it

reads, in bold, all-capital letters:

**THE UNDERSIGNED DOES HEREBY DECLARE THAT THE TERMS OF THIS AGREEMENT HAVE BEEN COMPLETELY READ AND FULLY UNDERSTOOD. THIS AGREEMENT CONTAINS ARBITRATION LANGUAGE WHICH IS BINDING.**

---

[7]*Sic.*  No other "Paragraph 27" appears in the Agreement as exhibited to this Court.

¶35. Less than a year after signing the contract, Sanderson Farms terminated the Agreement, pursuant to Paragraph 23(c). According to a broiler supervisor for Sanderson Farms, Mr. Gatlin had illegally disposed of dead chickens by dumping them on the ground, in violation of Mississippi Board of Animal Health regulations and the terms of the Agreement. In December 1997, Sanderson Farms had inspected the Gatlins' farm and found approximately 200 dead chickens dumped on the ground in a small thicket near one of the chicken houses. Mr. Gatlin allegedly confessed to having dumped the chickens, admitted his mistake, and asked for another chance. Sanderson Farms denied Mr. Gatlin's request, took its most recent shipment of chickens, and delivered them to another grower. Mr. Gatlin claims that he immediately contacted every other poultry processing company in his area, but none of these companies would deliver him any chickens. Also, his account of Sanderson Farms' motive for terminating the contract is different: he claims that his questioning of company procedures led Sanderson Farms to target him for termination.

¶36. In February 1998, Mr. Gatlin filed a demand for arbitration with the American Arbitration Association (AAA), claiming that Sanderson Farms had wrongfully terminated the contract. The AAA acknowledged receipt of Mr. Gatlin's payment of $1,250, but informed him that it could not proceed with the administration of the matter until he paid the remainder of the filing fee, $750. Mr. Gatlin at this point took the position that Sanderson Farms should pay one half of the filing fee. Sanderson Farms disagreed, claiming that even though the cost of arbitration is to be divided equally among the parties, according to the AAA rules, each party is responsible for its own expenses and attorney fees, and the filing fee is one such expense.

¶37. The following month, Mr. Gatlin paid the remaining $750 due for the filing fee. The arbitration then proceeded for more than a year, with each party participating in selecting arbitrators and exchanging documents, all in preparation for the arbitration hearing. That hearing was originally scheduled for May 1999, but was postponed until August of that year. Less than two weeks before the scheduled hearing, Mr. Gatlin received a billing statement from AAA requesting an additional $8,250 in fees to cover his share of the costs.[8] Mr. Gatlin claims that he could not afford these additional costs and was thus forced to abandon the arbitration process. Instead, for a filing fee of $94, he and his wife filed this lawsuit in Jones County Circuit Court.

## STANDARD OF REVIEW

¶38. This interlocutory appeal presents issues of both fact and law. When the issues presented on an interlocutory appeal are questions of law, this Court will review those issues

---

[8]This figure apparently represents Mr. Gatlin's 50% share of the cost of arbitration, which the AAA invoice lists as including $6,900 in arbitrators' compensation and $1,000 in arbitrators' expenses as well as a $250 administrative fee and $100 "miscellaneous expenses." Mr. Gatlin had previously paid $750 to AAA for mediation, as required by the Agreement, that was unsuccessful in resolving the dispute. Together with the $2,000 filing fee, this brought the total to approximately $11,000 Mr. Gatlin would have to pay before his dispute would ever be heard by the arbitration panel.

While the record is unclear whether the $8,250 last billed to Mr. Gatlin represented only his half of the required costs or both his and Sanderson Farms' share, I note that the Gatlins' brief consistently treats the $8,250 as *his half*, and *never* raises the injustice of paying both sides' fee as an issue—an inconceivable oversight, were that the case. See also footnote 18 *infra*, quoting the trial court's order. For purposes of this dissent, therefore, I treat the $8,250 as being only Mr. Gatlin's share.

21

de novo. *Gant v. Maness*, 786 So. 2d 401, 403 (Miss. 2001). "Whether the circuit court ha[s] proper jurisdiction to hear a particular matter is a question of law, and this Court must therefore apply a de novo standard of review to this issue." *Entergy Miss., Inc. v. Burdette Gin Co.*, 726 So. 2d 1202, 1204-05 (Miss. 1998). This Court will not interfere with a trial court's findings of fact unless they are manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *Bell v. Parker*, 563 So. 2d 594, 596-97 (Miss. 1990). Whether or not a given contract is unconscionable is a matter of law. Miss. Code Ann. § 75-2-302(1) (Rev. 2002); *see Raesly v. Grand Housing, Inc.*, 105 F. Supp. 2d 562, 567-68 (S.D. Miss. 2000) (citing official comment to § 2-302(1) of Uniform Commercial Code).

## DISCUSSION

¶39.    This Court recently reiterated its adherence to the "federal policy favoring arbitration, . . . requiring that we rigorously enforce agreements to arbitrate." *East Ford, Inc. v. Taylor*, 826 So. 2d 709, 713 (Miss. 2002) (quoting *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987) (internal quotation marks omitted)).

¶40.    The U.S. Supreme Court has noted that Congress intended to favor arbitration and that its "advantages often would seem helpful to individuals" as "a less expensive alternative to litigation." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995). Consistent with those advantages is the underlying assumption that, in agreeing to arbitrate their future disputes, parties forfeit none of their substantive rights, but simply choose a different forum for the vindication of those rights. *See Gilmer v. Interstate/ Johnson Lane Corp.*, 500 U.S. 20, 26, 111 S. Ct. 1647, 114 L. Ed. 2d 26 (1991)

(citation omitted). I bear these principles in mind throughout this interlocutory review of the denial of Sanderson Farms' motion to compel arbitration.

¶41. "In determining the validity of a motion to compel arbitration under the Federal Arbitration Act, courts generally conduct a two-pronged inquiry." *Taylor*, 826 So. 2d at 713. "The first step is to determine whether the parties agreed to arbitrate the dispute in question," *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996), and the second step is to determine "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S. Ct. 3349, 87 L. Ed. 2d 444 (1985)). The first step itself has two parts, requiring the court to ascertain "(1) whether there is a **valid** arbitration agreement and (2) whether the parties' dispute is within the scope of the arbitration agreement." *East Ford, Inc. v. Taylor*, 826 So. 2d at 713 (emphasis added). Section 2 of the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1 et seq., states that written arbitration provisions in contracts "shall be **valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.**" (emphasis added).[9] One of those grounds is unconscionability, and an arbitration agreement may be

---

[9] In discussing the legislative history of the FAA, the U.S. Supreme Court stated: "The House Report accompanying the Act makes clear that its purpose was to place an arbitration agreement 'upon the same footing as other contracts, where it belongs,' and to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate." *Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 219-20, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985) (citation omitted).

The FAA has been held applicable to employment contracts even where "interstate commerce" is not obviously implicated. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 121-22, 122 S. Ct. 1302, 149 L. Ed. 2d 234 (2001). The FAA applies to the maximum limit of Congress's powers under the Commerce Clause. *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 274-75, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995).

held invalid on state-law grounds where it is unconscionable. *Taylor*, 826 So. 2d at 713

(citing *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686-87, 116 S. Ct. 1652, 134 L.

Ed. 2d 902 (1996)).[10]  In *Casarotto*, it was made clear that "[c]ourts may not, however,

invalidate arbitration agreements under state laws applicable *only* to arbitration provisions.

By enacting § 2, we have several times said, Congress precluded States from singling out

arbitration provisions for suspect status, requiring instead that such provisions be placed

'upon the same footing as other contracts.'"  *Casarotto*, 517 U.S. at 687.

¶42.   Because the issue of unconscionability goes to whether any valid arbitration

agreement exists in this case, I begin with that issue.

## I.   IS THE ARBITRATION CLAUSE UNCONSCIONABLE AND THUS UNENFORCEABLE?

¶43.   The Gatlins claim that the arbitration clause is unconscionable because it imposes

prohibitive forum costs and deprives them of legal remedies (punitive damages) that would

be available but for the arbitration clause.  Sanderson Farms responds by asserting that the

---

[10]Although this Court in *Taylor* stated that unconscionability falls under the second prong of the analysis, *Taylor*, 826 So. 2d at 709 (citing *Casarotto*, 517 U.S. at 686), *Casarotto* does not discuss the second prong of the arbitration analysis or place unconscionability under it.  Rather, *Casarotto* states that "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2" of the FAA.  *Casarotto*, 517 U.S. at 687; *cf. Taylor*, 826 So. 2d at 713.  *Webb*, upon which *Taylor* drew for its "two prongs" analysis, states of the Webbs' unconscionability argument that it "relate[s] to the validity of the agreements to arbitrate."  *Webb*, 89 F.3d at 258.  We should follow *Taylor* in adopting the steps delineated in *Webb* and correct any misunderstanding created by *Taylor*'s reference to *Casarotto*.  Logically, the validity of the arbitration agreement is the first question for a court to decide.

24

unconscionability argument was not properly preserved for appeal and was not made part of the record until this Court granted the interlocutory appeal. Further, Sanderson Farms argues, the unconscionability argument is an attack on the entire Broiler Production Agreement, not just the arbitration provision; thus, the FAA requires that this claim be heard by the arbitrators, not the court. In my view, Sanderson Farms is **incorrect** on both counts.

¶44. Even though the circuit court decided to deny Sanderson Farms' motion to dismiss on the ground that Sanderson Farms had breached the Agreement and thereby waived the right to compel arbitration, the Gatlins contend that this Court can affirm that decision on other grounds. The Gatlins are correct. This Court may affirm a decision on appeal for a different reason than it was decided by the lower court. *See Askew v. Askew*, 699 So. 2d 515, 519 n.3 (Miss. 1997) (holding that "a trial court judgment may be affirmed on grounds other than those relied upon by the trial court"); *Stewart v. Walls*, 534 So. 2d 1033, 1035 (Miss. 1988) (holding that "this Court will affirm the lower court where the right result is reached, even though we may disagree with the reason for the result"). Nor is this Court's jurisdiction limited to those issues raised in the petition for interlocutory appeal; rather, this Court's review may "extend[ ] to the full scope of the interests of justice." *Pub. Employees' Ret. Sys. v. Hawkins*, 781 So. 2d 899, 900-01 (Miss. 2001) (citing *McDaniel v. Ritter*, 556 So. 2d 303, 306-07 (Miss. 1989)).

¶45. The circuit court did not specifically state that the contract was procedurally unconscionable. However, at the hearing this exchange took place between the court and the attorney representing Sanderson Farms:

> The Court: Let me ask you this. Do y'all intend on carrying this to the Supreme Court? Don't you? on interlocutory appeal?
>
> Mr. Burson: Your Honor, we don't want to. You know, we would do it—
>
> The Court: Well, I want to see the Supreme Court have an opportunity to look at it myself. This is something, you know—if these people are entering into these contracts and they are required to enter into a contract, and—the only way they can get chickens from these growers is to enter into a contract where it says they've got to arbitrate and they have no remedy at law, **I don't know whether that's an appropriate way to require somebody to enter into a contract or not**. I really don't. It seems to me like it's a little far-reaching, **over-reaching**, heavy-handed. I could go on and use other words that might be appropriate or inappropriate.

(emphasis added). It would seem that the circuit court found the arbitration clause to be procedurally unconscionable.

¶46. In paragraph 8 of their complaint the Gatlins allege:

> The failure and refusal of the Defendant, Sanderson, to pay the deposit required by the American Arbitration Association, and to commence and go forward with the arbitration, have effectively deprived both Plaintiffs of their legal remedies and due process rights. Such a blatant course of bad faith and unfair dealing by the Defendant is both **unconscionable** and against public policy and should not be tolerated by the Court. Likewise, the arbitration provisions of paragraphs 26 and 27 of the contract are themselves **unconscionable** and against public policy and should be deemed by the Court to be unenforceable, as they place an undue burden on the Plaintiff and anyone else in Plaintiffs [sic] position by effectively denying access to all legal remedies except arbitration, which is cost prohibitive to the Plaintiff and anyone else similarly aggrieved by the Defendant.

(emphasis added).

¶47. The Gatlins' complaint alleged that the arbitration provisions are unconscionable; as such, this issue has been properly preserved for appeal. Unconscionability was raised by the Gatlins' counsel during the trial court's hearing on the motion to compel arbitration, and the trial court repeatedly expressed concern about the issue. Further, the fact that the circuit

26

court held in favor of the Gatlins on the issue of waiver and did not expressly reach the merits of the unconscionability claim does not prevent this Court from affirming the circuit court's view of the latter ground. Therefore, I will examine the unconscionability claim.

¶48. The FAA does not preempt state-law claims that an arbitration clause or contract is unconscionable. *Casarotto*, 517 U.S. at 687. Under the "*Prima Paint* rule," where a contract includes an arbitration clause, the **allegations of fraud, duress, or unconscionability under state law, must go to the arbitration clause in particular, not to the making of the contract as a whole, or else they are for the arbitrator to decide, not for the courts.** *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu*, 637 F.2d 391, 398 (5th Cir. 1981) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 406, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967)) (emphasis added).

¶49. "Unconscionability has been defined as 'an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party.'" *Burdette Gin Co.*, 726 So. 2d at 1207. Further, in order for a contract, or clause therein, to be unconscionable, there must exist unconscionability "at the time it was made." Miss. Code Ann. § 75-2-302 (Rev. 2002). This Court has said that a contract is unconscionable if it is "one such as no man in his senses and not under a delusion would make on the one hand, and as no honest and fair man would accept on the other." *Terre Haute Cooperage v. Branscome*, 203 Miss. 493, 503, 35 So. 2d 537, 541 (1948). Neither the Court nor the Legislature labeled this as substantive unconscionability, but it is clear that was what was meant at the time.

27

¶50. In addition to these established aspects of substantive unconscionability, this Court recently adopted the concept of procedural unconscionability. ***Burdette Gin Co.***, 726 So. 2d at 1207. Procedural unconscionability goes to the making or formation of the contract, as distinguished from substantive unconscionability, which goes to the actual terms of the contract. ***Id. See also Bank of Indiana, Nat'l Ass'n v. Holyfield***, 476 F. Supp. 104, 109-10 (S.D. Miss. 1979). In ***Burdette Gin Co.***, this Court held that an indemnity clause was procedurally unconscionable on the basis of lack of voluntariness: Burdette Gin had no one to contract with for energy but Entergy Mississippi, Inc., and it was established that Entergy practically never negotiated its contractual terms with clients. 726 So. 2d at 1208. Under the circumstances, Entergy was able "to essentially unilaterally impose" the clause on Burdette Gin. ***Id.*** The Court stated that "[t]he voluntariness factor alone is enough to find the indemnity clause unconscionable in this case." ***Id.*** at 1207-08.

¶51. Sanderson Farms claims in its reply brief that "it is universally accepted that, to be held unenforceable as 'unconscionable,' a contractual provision must be shown to be *both* procedurally *and* substantively unconscionable." (emphasis in original). While Sanderson Farms exaggerates, it is true that the case law of other jurisdictions is divided on this question. However, since the appeal in this case was filed, this Court has effectively resolved the uncertainty in favor of allowing procedural unconscionability alone to suffice. ***Taylor***, 826 So. 2d at 717. Nevertheless, I will discuss whether the contract was unconscionable, either procedurally or substantively.

### A. Was the arbitration clause procedurally unconscionable?

28

¶52.    The Gatlins argue that the arbitration clause is procedurally unconscionable, because Sanderson Farms unilaterally drafted it, the Agreement containing the clause was presented on a take-it-or-leave-it basis, and they were told the company would discontinue delivering chickens if they refused to sign. In determining whether a contract is procedurally unconscionable, this Court looks to the formation of the contract as follows:

> The indicators of procedural unconscionability generally fall into two areas: (1) lack of knowledge, and (2) lack of voluntariness. A lack of knowledge is demonstrated by a lack of understanding of the contract terms arising from inconspicuous print or the use of complex, legalistic language, disparity in sophistication of parties, and lack of opportunity to study the contract and inquire about contract terms. A lack of voluntariness is demonstrated in contracts of adhesion when there is a great imbalance in the parties' relative bargaining power, the stronger party's terms are unnegotiable, and the weaker party is prevented by market factors, timing or other pressures from being able to contract with another party on more favorable terms or to refrain from contracting at all.

*Burdette Gin Co.*, 726 So. 2d at 1207. "Procedural unconscionability is most strongly shown in contracts of adhesion presented to a party on a take it or leave it basis." *Id.* at 1208.

¶53.    The U.S. Supreme Court has forbidden, however, any state restriction on arbitration agreements that would require "greater information or choice in the making of agreements to arbitrate than in other contracts." *Casarotto*, 517 U.S. at 687 (quoting 2 I. Macneil, R. Speidel, T. Stipanowich, & G. Shell, *Federal Arbitration Law* § 19.1.1, at 19:4-19:5 (1995)).

¶54.    The Gatlins claim that the agreement which contains the arbitration clause was unilaterally drafted by Sanderson Farms, pointing out that the agreement refers to Sanderson Farms by name, but Mr. Gatlin is simply referred to as "the Grower," except for his signature. The Gatlins further claim that because of financial pressures, chiefly their $250,000 debt owed to Sanderson Farms, they were effectively forced to sign. Sanderson

29

Farms does not dispute that the agreement including the arbitration clause was presented on a  take-it-or-leave-it basis and that it would not continue to deliver chickens if Mr. Gatlin refused to sign.

¶55.    Although the Gatlins' argument goes primarily to the lack of voluntariness, and not the lack of knowledge, Sanderson Farms responded to both, claiming that the undisputed facts show:

> Sanderson Farms began developing a new Broiler Production Agreement and held a series of meetings with its growers in 1996 at which the growers were given the opportunity to ask questions and provide input regarding the proposed terms of the new agreement.  Prior to the meetings, the growers received letters providing them with notice of the meetings and copies of the proposed agreement; the growers were invited to seek legal counsel regarding the terms of the agreement and to bring legal counsel to the meetings, and several did.  The terms of the agreement were discussed at the meetings and changes were made in responses to and in an attempt to address the concerns raised and comments received and drafts were sent out to the growers detailing the changes made.  In fact, changes were made specifically to the arbitration provision as a result of comments made and discussions had at the meetings. Mr. Gatlin attended the meetings and asked questions and made comments. Mr. Gatlin signed the new Broiler Production Agreement on January 1, 1997, only after having been afforded multiple opportunities to review and provide input regarding the terms and to seek legal counsel.

¶56.    Notes of those meetings in the record indicate that Mr. Gatlin attended at least one meeting and participated in the discussion:

> 5.      Roy Gatlin    —Why does the grower have to pay for vitamins?  Why are they included in the standard cost?
>
> . . . .
>
> 16.    Roy Gatlin    —Feed mill is better than it used to be.

¶57.    Additionally, Sanderson Farms denies occupying a monopolistic position in the industry.  It claims that in 1997, the year Mr. Gatlin signed the agreement, there were at least

seven other major poultry processing companies in the state of Mississippi, and other poultry growers in Jones County were growing for other companies at that time. Hence, in the view of Sanderson Farms, Mr. Gatlin could have taken his business elsewhere rather than accept the arbitration clause.

¶58. In our recent decision in *Taylor*, we held an arbitration clause unenforceable on procedural unconscionability grounds where it was "preprinted on the document" in type "less than one-third the size of many other terms in the document, appears in very fine print and regular type font," whereas "all of the details concerning the vehicle Taylor purchased [were] in boldface print." *Taylor*, 826 So. 2d at 716-17. Except for being preprinted, none of these conditions applies to the arbitration clause that Mr. Gatlin signed. Indeed, a special all-bold, all-capitalized notice regarding the arbitration provision was placed just above his signature on the Agreement.

¶59. Moreover, Mr. Gatlin's arguments about his lack of voluntariness do not apply strictly to the arbitration clause, but rather to his entering into the Agreement as a whole. Therefore, the rule of *Prima Paint*, as properly extended to unconscionability by the Fifth Circuit in *Haydu*, applies. His "claims regarding . . . unconscionability are ones that, in the event of arbitration, would be decided by an arbitrator, not the [trial] court, since they *go to the formation of the entire contract* rather than to the issue of misrepresentation in the signing of the arbitration agreement." *Haydu*, 637 F.2d at 398 (emphasis added).

¶60. We have recently applied the rule of *Prima Paint* in a case of alleged unconscionability in forming an arbitration agreement, holding that where a claim of procedural unconscionability went to the formation of a sales contract as a whole, not to the

31

arbitration agreement in particular, the dispute was to be arbitrated under the FAA. *Russell v. Performance Toyota, Inc.*, 826 So. 2d 719, 725-26 (Miss. 2002) (citing *Rojas v. TK Communications, Inc.*, 87 F.3d 745, 749, 751 n.3 (5th Cir. 1996)).[11]

¶61. Gatlin has failed to meet his burden of presenting substantial evidence that his entering into the arbitration clause itself, as opposed to his making the Agreement as a whole, was procedurally unconscionable. Whatever pressures he faced to sign the Agreement (such as those expounded upon in the plurality opinion) were not specific to the arbitration clause. Moreover, any assertions that Gatlin somehow failed to realize the gravity of his agreement to arbitrate, so that state unconscionability law prevails (as the plurality argues), are barred by *Casarotto*. This Court cannot hold that Gatlin was entitled to special protections merely because the Agreement contained an arbitration clause. Therefore, Gatlin's alleged lack of voluntariness is reserved by the FAA for the arbitral forum.

### B. Was the arbitration clause substantively unconscionable?

¶62. The Gatlins claim that the arbitration clause by its express terms closes the courthouse doors to individual growers and imposes excessive costs that prohibit growers from obtaining relief through arbitration, effectively leaving the growers with no recourse for the company's

---

[11]Although *Prima Paint* explicitly referred only to federal courts, 388 U.S. at 406, the U.S. Supreme Court later held that the FAA applies in state courts as federal substantive law. *Southland Corp. v. Keating*, 465 U.S. 1, 16, 104 S. Ct. 852, 79 L. Ed. 2d 1 (1984). Thus, the *Prima Paint* rule binds state courts as well. *See Rosenthal v. Great W. Fin. Sec. Corp.*, 926 P.2d 1061, 1073 n.8 (Cal. 1996); *Holmes v. Coverall N. Am., Inc.*, 649 A.2d 365, 368-71 (Md. 1994); *Eddings v. So. Orthopedic & Musculoskeletal Assocs., P.A.*, 555 S.E.2d 649, 655 (N.C. Ct. App. 2001), *rev'd on other grounds*, 569 S.E.2d 645 (N.C. 2002) (per curiam); *see also Inv. Mgmt. & Research, Inc. v. Hamilton*, 727 So. 2d 71, 75-76 (Ala. 1999). *But see City of Blaine v. John Coleman Hays & Assocs., Inc.*, 818 S.W.2d 33, 37-38 (Tenn. Ct. App. 1991) (following dissent in *Prima Paint* rather than majority opinion).

32

violations of their legal rights.[12]  They argue that this effective exclusion from both arbitration and judicial determination is substantively unconscionable.  They also claim that the arbitration clause's mutual exclusion of punitive damages is unconscionable.

¶63.   While procedural unconscionability goes to the formation of the contract, substantive unconscionability goes to its actual terms.   "Plaintiff may prove substantive unconscionability if she proves the terms of the arbitration clause were oppressive." **Smith v. Equifirst Corp.**, 117 F. Supp. 2d 557, 560 (S.D. Miss. 2000).  An arbitration agreement typically will not be held unconscionable because of excessively high fees without a "likelihood" or "substantial evidence" that excessively high fees are being charged. *See, e.g.,* **First Family Fin. Servs. v. Fairley**, 173 F. Supp. 2d 565, 571 (S.D. Miss. 2001). *Cf.* **Fleetwood Enters., Inc. v. Bruno**, 784 So. 2d 277, 281 (Ala. 2000).

## II.  WERE THE ARBITRATION FEES UNCONSCIONABLE?

¶64.   On appeal, the Gatlins cite the recent U.S. Supreme Court decision regarding potentially exorbitant arbitration fees, in which the Court stated:

> It may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum.  But the record does not show that Randolph will bear such costs if she goes to arbitration.  Indeed it contains hardly any information on the matter. . . . The record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable.  The "risk" that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.

---

[12]As previously stated, the Commercial Arbitration Rules provide for a reduction or deferment of the fees in the event of extreme hardship.  While Mr. Gatlin claims that he was unable to afford the arbitration fees, there is no indication that he ever made an effort to avail himself of the benefits of this provision in the Rules.

***Green Tree Fin. Corp.-Ala. v. Randolph***, 531 U.S. 79, 90-91, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2001).

¶65.     We first note that ***Randolph*** did not address unconscionability; the term does not even appear in that opinion's text.   Rather, ***Randolph*** addressed whether the existence of a statutory right implied a Congressional intent to supersede the FAA where necessary to preserve access to a legal forum.   *See **id.*** at 92; ***Camacho v. Holiday Homes, Inc.***, 167 F. Supp. 2d 892, 896 n.2 (W.D. Va. 2001) (***Randolph*** "did not evaluate the arbitration clause in issue under the equitable doctrine of unconscionability, but rather asked whether the plaintiff had established 'that arbitration would be prohibitively expensive,' thereby precluding her from 'effectively vindicating her federal statutory rights in the arbitral forum'" (citations omitted)).   Thus, ***Randolph*** is not directly relevant to an inquiry into unconscionability under Mississippi law.   Because ***Randolph*** is not applicable here, this Court is not limited to that opinion's focus on the costs of the arbitral forum, but may also consider Mr. Gatlin's own financial situation.   *See **Randolph***, 531 U.S. at 91 n.6; ***Ball v. SFX Broad., Inc.***, 165 F. Supp. 2d 230, 239-40 (N.D.N.Y. 2001) (***Randolph***'s "analysis, which focuses on the likelihood of substantial arbitration costs, is readily distinguishable from the analysis . . . focusing on the financial situation of the particular plaintiff").

¶66.     Where presented with arbitration clauses that impose egregious financial burdens on a party seeking redress, courts have responded by striking down such clauses, or the contracts containing them.   *See, e.g., **Circuit City Stores, Inc. v. Adams***, 279 F.3d 889, 894 (9th Cir. 2002) (holding fee-splitting clause unconscionable under California law); ***Cole v. Burns Int'l Sec. Servs., Inc.***, 105 F.3d 1465, 1483-89 (D.C. Cir. 1997); ***BankAmerica***

34

*Hous. Servs. v. Lee*, 2002 WL 737424, at \*10 (Ala. Apr. 26, 2002) (recognizing "unconscionability with respect to the imposition of excessive filing fees and arbitration costs on a claimant, when considered in the full context of the particular claimant's situation, including the claimant's financial resources"); *Armendariz v. Found. Health Psychcare Servs.*, 6 P.3d 669, 687 (Cal. 2000) (where arbitration imposed as condition of employment, "majority of jurisdictions to consider this issue" hold that no type of expense not required by court proceedings may be required of employee); *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 866 (Ohio 1998) (prepayment of fees likely to discourage party from seeking remedy);[13] *State ex rel. Dunlap v. Berger*, 567 S.E.2d 265, 281 (W. Va. 2002) (generally holding unconscionable clauses of adhesion which "would impose unreasonably burdensome costs upon or would have a substantial deterrent effect upon a person seeking to . . . obtain statutory or common-law relief and remedies that are afforded by or arise under state law that exists for the benefit and protection of the public").[14]

---

[13]Most of these cases involve employment contracts, while, in Sanderson Farms' view, Mr. Gatlin was an "independent contractor." But, perusing the pages upon pages of rules, conditions, and inspections to which Mr. Gatlin's independence is subjected by the Agreement, I entertain some doubt as to the validity of this classification. Indeed, this case arose out of Sanderson Farms' exercise of control over the hygienic details of chicken-farming. "An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor is subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." *Heirs & Wrongful Death Beneficiaries of Branning ex rel. Tucker v. Hinds Cmty. Coll. Dist.*, 743 So. 2d 311, 316 (Miss. 1999).

[14]The West Virginia court specified that it would equally strike down provisions unrelated to arbitration that imposed such burdens, so that it was not creating a special rule for arbitration cases. *Id.* at n.14. This Court should naturally follow the same principle.

¶67.    Considering a consumer's claim under the Consumer Protection Act, another court put the issue succinctly: "If the up front costs of arbitration have the practical effect of deterring a consumer's claim, the arbitration agreement should not be enforced." *Mendez v. Palm Harbor Homes, Inc.*, 45 P.3d 594, 607 (Wash. Ct. App. 2002) (citations omitted).

¶68.    Summing up the views of the federal circuits, the Fourth Circuit found it "undisputed that fee splitting can render an arbitration agreement unenforceable where the arbitration fees and costs are so prohibitive as to effectively deny the employee access to the arbitral forum." *Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 554 (4th Cir. 2001) (citations omitted).  I agree.

¶69.    There is nothing inherently unconscionable about fee-sharing.  The unconscionable aspect arises only when the employee is effectively denied both judicial and arbitral redress by the combination of binding arbitration and exorbitant arbitration fees.  Because the party challenging arbitration has the burden of showing it to be unconscionable, most courts have held that the alleged unconscionability must be determined on a case-by-case basis, and that evidence based on other parties' experiences with arbitration or on average costs of arbitration is too speculative.  *See, e.g., Bradford*, 238 F.3d at 556 n.5.  I agree with this approach.  However, I would not adopt the Fourth Circuit's holding that the challenger must also prove "the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims." *Id.* at 556.  This requirement reintroduces the speculative element against the challenger after having disallowed similar speculation in his favor.  Obviously, litigation costs are difficult to

estimate in advance. Rather, it should be for the courts to determine on a case-by-case basis whether the actual cost of arbitration is so egregious that it shocks the judicial conscience.

¶70. My conscience is shocked by a plaintiff's being billed $11,000 or more, simply to obtain a hearing (exclusive of attorney fees). A country in which legal redress was available only at such costs would deserve the criticism that Edward Gibbon directed at the Roman Empire's system of justice:

> The expense of the pursuit sometimes exceeded the value of the prize, and the fairest rights were abandoned by the poverty or prudence of the claimants. **Such costly justice might tend to abate the spirit of litigation, but the unequal pressure serves only to increase the influence of the rich, and to aggravate the misery of the poor.** By these dilatory and expensive proceedings, the wealthy pleader obtains a more certain advantage than he could hope from the accidental corruption of his judge.

2 Edward Gibbon, *The Decline and Fall of the Roman Empire* 1480 (J.B. Bury ed., Modern Library 1995) (1788) (emphasis added). Arbitration, indeed, has been promoted as "abating the spirit of litigation," but it cannot be permitted to do so at the price of effectively denying plaintiffs any forum in which to redress grievances. That would violate the law against unconscionable dealings. *See, e.g., **Phillips v. Assocs. Home Equity Servs.**,* 179 F. Supp. 2d 840, 846 (N.D. Ill. 2001) ($4,000 filing fee plus shared expenses of arbitration would effectively exclude financially strapped plaintiff from seeking remedy).

¶71. Given that requiring such costs of Mr. Gatlin would be prima facie unconscionable, the harder questions remain: first, whether such costs have been assessed, and if so, what to do about it. An exemplary case from the federal courts serves as an excellent guide in addressing these questions.

37

¶72.    In *Dobbins v. Hawk's Enterprises*, 198 F.3d 715, 716 (8th Cir. 1999), the purchasers

of a mobile home that was delivered with substantial damage filed suit in the United States

District Court for the Eastern District of Arkansas, claiming damages under multiple legal

theories, including the Truth in Lending Act.  The defendants filed a motion to stay the

federal court proceeding and compel arbitration, which the district court granted.  *Id.*  The

Dobbinses filed a motion to lift the stay "on the basis that the fees imposed by the American

Arbitration Association . . . and their inability to pay the fees prevented them from

effectively asserting their claims."  *Id.*  After an evidentiary hearing, "the district court lifted

the stay, reopened the case, and found that the arbitration fees precluded the Dobbinses from

availing themselves of the arbitral forum."  *Id.* The defendants appealed, and the Eighth

Circuit reversed and remanded with instructions:

> As the district court noted in its order, courts across the country have begun to recognize the potential that arbitration fees will make an arbitration agreement unconscionable.  We agree with those courts that the potential is present.  However, **whether or not arbitration fees make the agreement to arbitrate unconscionable is something that must be determined on a case-by-case basis** in light of the **state law** governing unconscionability.
>
> In this case, the Dobbinses claim that the final fee determination they received from the AAA was $23,000.  The district court found this fee to be oppressive and therefore granted the stay. The AAA, however, has a fee waiver procedure. It decides whether or not to waive, in whole or in part, a fee on the basis of a claimant's financial situation.  It is clear, however, from our reading of the evidentiary hearing transcript, that the Dobbinses never fully explored the AAA's fee waiver procedures because Mr. Dobbins refused to provide his family's financial information to the AAA.  **This is an important step that must be taken before an unconscionability determination can be made.**
>
> Therefore, **in an effort to foster the policy in favor of arbitration**, we reverse and remand this case with directions to order the Dobbinses to present a reduced demand for damages and to seek a diminution or a waiver of fees from the AAA.  The district court also should retain jurisdiction over the case to determine if the fee, if not waived all together, is lowered to a reasonable

amount.  If the district court finds that the fee is unreasonable given the current financial situation of the Dobbinses, the district court should **accept the appellant's offer to pay the arbitration fees**.

*Id.* at 717 (emphasis added).

¶73.  For its part, Sanderson Farms suggests that if this Court finds any portion of the arbitration provision unconscionable, "it should sever or modify such portion and compel arbitration, as opposed to nullifying the entire arbitration provision."  A severability provision is indeed included in the Agreement.  Further, pursuant to the UCC:

> (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

Miss. Code Ann. § 75-2-302 (Rev. 2002).  Sanderson Farms further cites *Quinn v. EMC Corp*., 109 F. Supp. 2d 681, 685-86 (S.D. Tex. 2000), as follows:  "Even if the Court were convinced that Plaintiff cannot afford to pay for the arbitration proceeding, the better solution would be to nullify the fee provisions of the arbitration agreement and have Defendant EMC shoulder the expense. Plaintiff's proposed solution—abrogation of the entire arbitration agreement—is unnecessarily radical." Sanderson Farms does not, however, offer to shoulder the cost of arbitration if the cost-allocation provision is stricken, thus distinguishing the present facts from *Dobbins*.

¶74.  A great difference exists, at Mississippi law, between a court's *severing* an unconscionable provision and its *rewriting* a contract to include terms that neither party envisioned at the outset.  "Courts cannot write into a contract that which fails to appear." *S. Natural Gas Co. v. Fritz*, 523 So. 2d 12, 18 (Miss. 1987).  While we have recognized that

equity may direct us not to enforce a contractual provision, *First Nat'l Bank of Vicksburg v. Caruthers*, 443 So. 2d 861, 864 n.3 (Miss. 1984), that is not the same thing as enforcing a new provision of our own creation. It bears repeating that we are forbidden by the FAA to treat arbitration provisions in contracts any differently than we would other contractual clauses.

¶75.    Admittedly, in stating that "this Court does not rewrite contracts when they are not illegal, immoral, or contrary to public policy," *Travelers Indem. Co. v. Chappell*, 246 So. 2d 498, 510 (Miss. 1971), we have left open the implication that we *do* rewrite them when those conditions do exist. We do so, however, in light of the "general rule in this state and elsewhere . . . that reformation of a contract is justified only (1) if the mistake is a mutual one, or (2) where there is a mistake on the part of one party *and* fraud or inequitable conduct on the part of the other." *Johnson v. Consol. Am. Life Ins. Co.*, 244 So. 2d 400, 402 (Miss. 1971) (emphasis added). Moreover, this mistake "must be in the drafting of the instrument, not in the making of the contract." *Id.* Nothing in the record supports a finding that the cost-allocation provision was a mere slip of the pen. No mistake has been shown on either side, so the rule of *Johnson* will not permit us to rewrite the fee provision of the arbitration clause.

¶76.    Nor have courts invariably leapt at the opportunity to pencil in their own allocations of arbitration fees, even where one party offered to bear the entire cost (which is not true in the case presently before us). A Florida court ruled that, where one party "offered to pay all the costs of arbitration notwithstanding the language of the agreement, . . . we are not authorized to remake the parties' contract." *Flyer Printing Co. v. Hill*, 805 So. 2d 829, 833

40

(Fla. Dist. Ct. App. 2001); *see also **Mercuro v. Superior Court***, 116 Cal. Rptr. 2d 671, 684 (Cal. Ct. App. 2002).

¶77.　Neither is it wise to allow companies to draft arbitration clauses with unconscionable provisions and then let them try them out in the marketplace, secure in the knowledge that the courts will at worst sever the offending cost allocation after plaintiffs have been forced "to jump through hoops in order to invalidate those agreements." ***Cooper v. MRM Inv. Co.***, 199 F. Supp. 2d 771, 782 (M.D. Tenn. 2002); *see **Perez v. Globe Airport Sec. Servs., Inc.***, 253 F.3d 1280, 1287 (11th Cir. 2001), *reh'g en banc denied*, 273 F.3d 1118 (11th Cir. 2001) (table), *vacated on stipulation of parties*, 294 F.3d 1275, 1276 (11th Cir. 2002).

¶78.　I thus find ***Dobbins*** persuasive in part.  While Mr. Gatlin claims he was unable to afford arbitration, there is insufficient evidence on the record before us for this Court to make that determination, in light of the potential for the arbitrator to make a finding of financial hardship on Mr. Gatlin's part.

¶79.　Therefore, I would reverse and remand with directions to the circuit court to first order Mr. Gatlin to seek a diminution or waiver of fees from the AAA.  The circuit court should retain jurisdiction over the case to determine whether the fee, if not altogether waived, has been lowered to a reasonable amount.  Upon the AAA's making its finding regarding hardship, the circuit court must then conduct a hearing to determine whether Mr. Gatlin's financial situation prevents him from affording the arbitration fee. [15] Sanderson Farms would

___

[15] The central point of the unconscionability analysis is *access to redress*.  If a fee of $11,000 denies Gatlin access to *any* forum in which he may seek redress, it is unconscionable. The same fee would not deny Bill Gates access to a forum, and thus would not be unconscionable in his case.  The financial situation of the party seeking redress, therefore, has a great deal to do with unconscionability.  A fact-specific finding must be made and thus it is for the trial court, and

be able to present evidence at this stage to support the position that Mr. Gatlin is able to bear the cost of arbitration. ***Blair v. Scott Specialty Gases***, 283 F.3d 595, 610 (3d Cir. 2002) (once initial showing made that cost is prohibitive, burden shifts to other party). If the circuit court determines this to be the case, it should then apply the Agreement's severability clause to strike the arbitration clause from the Agreement. While this approach may seem radical or cumbersome to some, it derives from this Court's fidelity both to existing Mississippi case law and to the FAA's requirement that arbitration clauses be judged under the same law as would govern any contract.

### III. WAS THE WAIVER OF PUNITIVE DAMAGES UNCONSCIONABLE?

¶80. Because the AAA should have the opportunity to find that Mr. Gatlin does indeed merit a hardship diminution or waiver of his fees, such that they would not be unconscionable, it thus is necessary to address the additional contention that the parties' mutual waiver of punitive damages was unconscionable in itself.

¶81. The Agreement provided, under its arbitration clause, that "[t]he arbitrators will have the authority to award actual money damages as provided in Section 15 . . . , specific performance, and temporary injunctive relief, but the arbitrators shall not have the authority to award exemplary or punitive damages, and the parties expressly waive any claimed right to have such damages." Section 15 of the contract, cited in the arbitration clause, reads as follows:

not this Court, to make it.

42

**15.** **LIMITATION OF DAMAGES.** Sanderson will not be responsible for (i) damage or loss to the Grower or to any of the Grower's property; (ii) loss to the Grower for services rendered, or (iii) damage or loss to Grower resulting from Sanderson's failure or delay in the fulfillment or performance of this Agreement if any such loss or damages is caused, directly or indirectly, (x) by circumstances beyond the control of Sanderson . . . or (y) by the Grower's negligence. Sanderson will not be liable to Grower for, and Grower, as a part of the bargain of this Agreement, waives claims against Sanderson for punitive and exemplary damages. For any claim by Grower against Sanderson arising out of or relating to the terms of this Agreement, Sanderson will be liable only for contract damages and other damages relating directly to the breach, provided that such other damages are proved by clear and convincing evidence. For any claim by Grower against Sanderson that is not arising out of or relating to the terms of this Agreement, Sanderson will be liable for actual damages proximately caused by any wrongful conduct. Grower's liability to Sanderson for claims arising under or relating to this agreement will be limited to damages specifically set forth herein. For any claim by Sanderson against Grower that is not arising out of or relating to this Agreement, Grower will be liable for actual damages proximately caused by any wrongful conduct.

¶82. The Gatlins argue that arbitration must provide "all of the types of relief that would otherwise be available in court." *Cole*, 105 F.3d at 1482. They cite the U.S. Supreme Court for the already-mentioned provision that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi*, 473 U.S. at 628.

¶83. Sanderson Farms distinguishes the argument from *Mitsubishi* as relevant only where a "statutory claim" to punitive damages exists. It argues that, since there is no right to punitive damages in Mississippi, it cannot be unconscionable for Gatlin and Sanderson Farms mutually to waive the pursuit of punitive damages. *See Choctaw Maid Farms, Inc. v. Hailey*, 822 So. 2d 911, 923 (Miss. 2002) (no right to punitive damages). It further cites a recent federal district court decision which followed the Third Circuit in holding that "a

contractual waiver of punitive damages is irrelevant to the issue of whether the plaintiff's claims should be arbitrated." *Herrington v. Union Planters Bank N.A.*, 113 F. Supp. 2d 1026, 1032 (S.D. Miss. 2000) (quoting *Great W. Mortgage Corp. v. Peacock*, 110 F.3d 222, 232 (3d Cir. 1997)).  The Third Circuit's reasoning is as follows:

> The availability of punitive damages is not relevant to the nature of the forum in which the complaint will be heard. Thus, availability of punitive damages cannot enter into a decision to compel arbitration. [The New Jersey Law Against Discrimination] provides that a victim of unlawful discrimination may be awarded punitive damages, but the issue of whether this right has been waived is separate and apart from the issue of whether an employee has agreed to an arbitral forum, and hence, is for the arbitrator to decide.

*Peacock*, 110 F.3d at 232 (citations omitted).  This reasoning is not persuasive.  Whether a party has bound itself to unconscionable terms is relevant to the validity of the arbitration contract under § 2 of the FAA.

¶84.    The Fifth Circuit has recently issued an opinion which, while not directly addressing the issue at hand, seems more persuasive, as well as suggesting that the above argument in *Peacock* has been implicitly overruled:

> The circuit courts are split on whether the enforceability of an arbitration clause should be adjudicated before arbitration when a party contends that public policy prevents the clause's waiver of certain remedies. Although the question is close, [citations to *Peacock* and other cases omitted], we conclude that appellate jurisdiction exists because Investment Partners seeks to void the entire arbitration clause on public policy grounds, albeit by means of attacking the remedy provision, and the Supreme Court disposed of a similar argument, without submitting the issue first to the arbitrators, in *Green Tree Financial Corp. v. Randolph*, 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000).
> . . . .
> [P]unitive damages are awarded under notoriously open-ended legal standards and a broadly defined constitutional limit concerning the amount awarded. Treble damages, however, represent a mere mathematical expansion of the actual damages calculated by the arbitrator. While **private parties might well exclude common law punitive damages, with all their uncertainty, from the**

> **arbitrator's authority**, the riskiness of committing antitrust damages to the arbitrator is much smaller.

*Inv. Partners, L.P., v. Glamour Shots Licensing, Inc.*, 298 F.3d 314, 316, 317-18 (5th Cir. 2002) (emphasis added). Apart from the persuasiveness of considering unconscionability up front, the Fifth Circuit's remarks on the motives for excluding punitive damages are also persuasive. It is not obviously contrary to sound business sense that parties would seek to avoid the specter of punitive damages.

¶85.	The Supreme Court of Alabama has recently considered the waiver of punitive damages in an arbitration contract and found it unconscionable. *Ex parte Thicklin*, 824 So. 2d 723, 733 (Ala. 2002). However, the *Thicklin* decision was predicated upon state-law grounds that have no obvious parallel in Mississippi law or jurisprudence. I am not willing to interpret our Legislature as having established a public policy, favoring punitive damages, of such force as to negate private parties' efforts to mutually waive the opportunity to seek such damages from each other. Any such public policy limiting the freedom of contract should be announced by the Legislature in no uncertain terms. The present Agreement's arbitration clause, as opposed to Section 15 of the Agreement, creates a *mutual* waiver of punitive damages. Thus it is unnecessary to consider the situation in which the drafter of the contract immunizes itself from punitive damages while retaining for itself the option of seeking such damages.[16]

---

[16]This, too, distinguishes *Thicklin*, which relies on several Alabama cases involving *unilateral* releases from liability for punitive damages.

¶86.    I would hold that parties are free to contract with each other to renounce any claim to punitive damages against each other.   The claim of that clause's substantive unconscionability is therefore without merit.[17]

### IV.    DID THE TRIAL COURT ERR BY HOLDING THAT A BREACH OF THE ARBITRATION AGREEMENT WAIVED SANDERSON FARMS' RIGHT TO COMPEL ARBITRATION?

¶87.    As with the issue of punitive damages, should the AAA have the opportunity to determine whether the Gatlins qualify for hardship status, it is instructive to address it here.

¶88.    The circuit court found that, because Sanderson Farms would not pay half of the $2000 filing fee,[18] it breached the provisions of the arbitration clause and thereby waived its right to compel arbitration.  Sanderson Farms argues that under federal law, the circuit court lacked jurisdiction to rule on an alleged breach of the arbitration agreement, which was itself reserved by the Agreement for the judgment of the arbitrators.

---

[17]Any question as to whether Gatlin entered into that agreement unknowingly, so as to raise the issue of procedural unconscionability, goes to his entering into the entire contract, and thus should be left for the arbitrator, as discussed at issue I.A. *supra*. It has not been alleged in the record that the Agreement that Gatlin signed was different from any earlier agreement *only* in its including an arbitration clause; as Sanderson Farms pointed out, many other provisions were changed.  Hence ***Prima Paint*** controls. It is unnecessary to address the question of a party in Gatlin's situation who is forced to renew an existing contract on terms that differ only in their including an arbitration clause, but such a claim might well be decidable by the courts under ***Prima Paint***.

[18]I believe that half the filing fee, not half the total costs of arbitration, is at issue here. Certainly that is how the circuit court viewed the issue in its order:  "When Sanderson Farms, Inc. refused to pay its **one-half of the filing fees** to the American Arbitration Association, it in effect breached its contract with the Plaintiffs.  It is the opinion of this [c]ourt that having breached its contract, Sanderson Farms cannot, at this point, require the Plaintiffs to submit to arbitration." (emphasis added).

¶89. Because this issue arises in the context of arbitration, this Court must be especially wary of the temptation to plunge into a consideration of the merits of the issue. The court's role is extremely limited in disputes concerning arbitration agreements, and the court must compel arbitration if the dispute is arbitrable. This Court has discussed this requirement as follows:

> The court's **sole function is to determine whether the claim is referable to arbitration**. Once that determination is made, the court **may not delve further into the dispute**. "The courts . . . **have no business weighing the merits of the grievance**, considering whether there is equity in a particular claim, or determining whether there is a particular language in the written instrument which will support the claim."

*I.P. Timberlands*, 726 So. 2d at 108 (quoting *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 567, 80 S. Ct. 1343, 4 L. Ed. 2d 1403 (1960) (emphasis added).

¶90. A recent decision of the U.S. Supreme Court helps to clarify what is and what is not open to a court to decide with regard to arbitration:

> " 'procedural' questions which grow out of the dispute and bear on its final disposition" are presumptively *not* for the judge, but for an arbitrator, to decide. *John Wiley, supra,* at 557, 84 S.Ct. 909 (holding that an arbitrator should decide whether the first two steps of a grievance procedure were completed, where these steps are prerequisites to arbitration). So, too, the presumption is that the arbitrator should decide "allegation[s] of **waiver**, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital, supra,* at 24-25, 103 S.Ct. 927.

*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, ___, 123 S. Ct. 588, 592, 154 L. Ed. 2d 491 (2002) (emphasis added) (holding that arbitrator, not court, must decide whether expiration of time limit for compelling arbitration acted to bar complainant from arbitrating). In their brief for the circuit court, the Gatlins raised the issue of default. Section 3 of the FAA addresses default as follows:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, **providing the applicant for the stay is not in default in proceeding with such arbitration**.

9 U.S.C. § 3 (emphasis added).

¶91.    The Gatlins read this section as providing that the determination of whether Sanderson Farms is in default and thereby waives its right to compel arbitration should be made by the trial court, and they argue that by failing to pay half of the filing fee, Sanderson Farms defaulted in proceeding with the arbitration.

### A. Applicability of the FAA to Determinations of Waiver

¶92.    A preliminary issue which must be addressed is the application of § 3 in state courts. Section 3 refers to "any of the courts of the United States."  Maryland's highest court has read this reference as limiting § 3 to the federal courts. *Wells v. Chevy Chase Bank, F.S.B.*, 768 A.2d 620, 625-26 (Md. 2001).

¶93.    The U.S. Supreme Court has never reached the issue of whether § 3 (and § 4, which refers to "any United States district court") are binding on the states.  In *Southland Corp. v. Keating*, the Court noted in passing that "we do not hold that §§ 3 and 4 of the [Federal] Arbitration Act apply to proceedings in state courts.  Section 4, for example, provides that the Federal Rules of Civil Procedure apply in proceedings to compel arbitration. The Federal Rules do not apply in such state-court proceedings." *Southland Corp.*, 465 U.S. at 16 n.10. Five years later, the Court observed that *Southland Corp.* had "expressly reserv[ed] the

48

question whether" those sections applied in state courts. *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 n.6, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989). The *Volt* Court did not reach the question either, observing that "we need not resolve it to decide this case." *Id.* at 477.

¶94.    In neither *Southland Corp.* nor *Volt* did the Court mention its footnote in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983), in which the Court stated:

> Although § 3 refers ambiguously to a suit "in any of the courts of the United States," the state courts have almost unanimously recognized that **the stay provision of § 3 applies to suits in state as well as federal courts, requiring them to issue the same speedy relief when a dispute is referable to arbitration.** (The North Carolina Supreme Court has so held, although not until after the District Court ordered this stay. *Burke County Public Schools Board of Education v. Shaver Partnership,* 303 N.C. 408, 279 S.E.2d 816 (1981).) This **is necessary** to carry out Congress's intent to mandate enforcement of all covered arbitration agreements; **Congress can hardly have meant that an agreement to arbitrate can be enforced against a party who attempts to litigate an arbitrable dispute in federal court, but not against one who sues on the same dispute in state court.** *See also Prima Paint,* 388 U.S., at 404, 87 S.Ct., at 1806.

460 U.S. at 27 n.34 (emphasis added). I note especially the language that the application of § 3 to state courts "is necessary to carry out Congress's intent." The citation to *Prima Paint* likewise points us to "the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts." 388 U.S. at 404. Insofar as § 3 fulfills that intent and that purpose, it must be binding on the states, since *Southland Corp.* held that Congress overrode

state law insofar as necessary to implement its "national policy favoring arbitration." *Southland Corp.*, 465 U.S. at 10.

¶95. The Texas Supreme Court has interpreted note 34 to *Moses H. Cone* as applying § 3 to state courts. *In re Bruce Terminix Co.*, 988 S.W.2d 702, 704 n.2 (Tex. 1998). The Florida Supreme Court has approved the decision of one of its intermediate courts that § 3 applies to state courts. *See Merrill Lynch Pierce Fenner & Smith v. Melamed*, 405 So. 2d 790, 793 (Fla. Dist. Ct. App. 1981), *aff'd*, 476 So. 2d 140 (Fla. 1985). *See also Wolff v. Fid. Brokerage Servs., Inc.*, 2002 WL 31382606, at *3 (Mass. Super. Ct. Sept. 5, 2002); *Stokes v. Metro. Life Ins. Co.*, 571 S.E.2d 711, 715 (S.C. Ct. App. 2002).

¶96. Although this Court has never addressed the issue of § 3's applicability, we have repeatedly cited federal law with regard to waiver of arbitrability. In this Court's recent decision in *Russell v. Performance Toyota, Inc.*, we stated that "a party waives arbitration if it **substantially** takes advantage of the judicial process" and quoted the Fifth Circuit for the rule that "to establish a waiver, the objector to arbitration must establish 'that a party seeking arbitration **substantially** invokes the judicial process to the detriment or prejudice of the other party.' " *Russell*, 826 So. 2d at 724 (quoting *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 326 (5th Cir. 1999)) (emphasis added). *See Cox v. Howard, Weil, Labousse, Friedrichs, Inc.*, 619 So. 2d 908, 913-14 (Miss. 1993) (applying FAA and federal case law for rule that "a party defaults on or waives a demand for arbitration under the Federal Arbitration Act when that party 'actively participates in a lawsuit or takes other action inconsistent with [the right to arbitration]' "); *see also Univ. Nursing Assocs., PLLC*

50

***v. Phillips***, 842 So. 2d 1270, 1276-77 (Miss. 2003) (relying on cases interpreting FAA, even while skeptical of whether FAA applicable to instant facts).

¶97.    The decisive consideration, however, is that the substantive provisions of the FAA (which are expressly binding on state courts) are frequently enforceable only in state courts. As the Fifth Circuit recently reiterated, there is no independent federal subject-matter jurisdiction under the FAA. ***Bank One, N.A. v. Shumake***, 281 F.3d 507, 513 (5th Cir. 2002). Hence, where no diversity or federal-question jurisdiction exists, parties seeking to enforce the FAA will have no choice but to turn to state courts for relief. As the Florida court in ***Melamed*** correctly stated:

> Fairness, logic, and constitutional constraints require us to enforce federal rights in state courts whenever Congress allows. Congress has allowed state courts to enforce federal arbitration rights, and has made state courts the exclusive forum for vindication of those rights except in those instances when the litigant can invoke federal jurisdiction on some independent ground. **We should not and cannot make the substance of a federal right depend on the fortuity of the existence of an independent ground of federal jurisdiction.**

***Melamed***, 405 So. 2d at 793 (emphasis added). The FAA "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate."

***Moses H. Cone***, 460 U.S. at 25 n.32. As the Tennessee Supreme Court has observed, in holding that this "body of federal substantive law" is binding on the states:

> To rule otherwise would permit and even encourage forum shopping, prevent and undermine the need for nationwide uniformity in the interpretation and application of arbitration clauses in foreign and interstate transactions, and permit individuals to circumvent the national law relating to arbitration agreements called for by the Federal Arbitration Act.

***Tenn. R. Pulp & Paper Co. v. Eichleay Corp.***, 637 S.W.2d 853, 857 (Tenn. 1982).

51

¶98. These considerations would, I think, strongly influence the U.S. Supreme Court if and when it is squarely confronted with the applicability of § 3 to the states. The Court's statement in *Moses H. Cone* that "Congress can hardly have meant that an agreement to arbitrate can be enforced against a party who attempts to litigate an arbitrable dispute in federal court, but not against one who sues on the same dispute in state court" suggests that it would not allow the determination of whether or not a suit can be arbitrated to hang upon which court a party petitions for a stay. And as the Court remarked in *Southland Corp.*, "since the overwhelming proportion of all civil litigation in this country is in the state courts," it would "encourage and reward forum shopping" to allow the choice of forum to be effectively determinative of whether arbitration can be enforced. 465 U.S. at 15. "We are unwilling to attribute to Congress the intent, in drawing on the comprehensive powers of the Commerce Clause, to create a right to enforce an arbitration contract and yet make the right dependent for its enforcement on the particular forum in which it is asserted." *Id.*

¶99. In its arbitration decisions after *Southland Corp.* and *Volt*, the U.S. Supreme Court has repeatedly reiterated its broad support for arbitration, with an overall tendency of expanding, not curtailing, the reach of the FAA. In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S. Ct. 1647, 114 L. Ed. 2d 26 (1991), the Court held that statutory claims are arbitrable, rejecting any arguments that arbitration was in any way defective in protecting the civil rights of claimants. In *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995), the Court put the broadest possible construction on the FAA's application to "transaction[s] involving commerce," confirming that the FAA reaches to the farthest extent of Congressional power under the Commerce

Clause. In *Casarotto*, as we have seen, the Court affirmed the states' limited power to invalidate arbitration clauses under § 2 while declaring invalid any state laws that would "undermine the goals and policies of the FAA." *Casarotto*, 517 U.S. at 688 (quoting *Volt*, 489 U.S. at 478). And in *Circuit City Stores, Inc. v. Adams*, as I have noted above, this Court held that the FAA applies to nearly all employment contracts. Given the Court's much broader application of the FAA in the almost 20 years since *Southland Corp.*, I find it highly implausible that the Court would take a giant leap backwards by holding that states need not consider themselves bound to follow § 3.

¶100. This point is missed by the Fifth Circuit when it "conclude[s] from the Supreme Court's opinions that state courts do not necessarily have to grant stays of conflicting litigation or compel arbitration in compliance with the FAA's sections 3 and 4." *McDermott Int'l, Inc. v. Lloyds Underwriters of London*, 944 F.2d 1199, 1210-11 (5th Cir. 1991). Consider parties whose dispute does not provide an independent basis for federal jurisdiction. They have agreed to arbitrate, but one party refuses. The other party cannot seek a stay in federal court, under *Shumake*. If the state courts can choose not to compel arbitration, then how can the FAA be said to apply to the states in any meaningful fashion? Against the Fifth Circuit's "*not necessarily*," this Court cites the "[t]his is *necessary* to carry out Congress' intent" language of the U.S. Supreme Court in *Moses H. Cone*.

¶101. If state courts were free to create expansive definitions of waiver or default, thus defeating stay applications that would have met the federal standard, the substantive guarantees of the FAA would be denied to that great majority of aggrieved parties whose disputes do not qualify for federal jurisdiction. I cannot imagine that, upon due

consideration (going beyond mere footnotes), the U.S. Supreme Court would approve such a two-tiered regime of arbitration law. To do so would eviscerate *Southland Corp.*

¶102. Therefore, and also because our Mississippi jurisprudence has long relied on the federal case law arising out of § 3, I would hold that § 3 governs applications for stays of arbitration under the FAA in our state courts. What suffices to show waiver or default under § 3, by the same token, must be neither more nor less than what suffices under federal law.

### B. Who Decides the Merits?

¶103. The Fifth Circuit has observed that:

> "There is a strong presumption against" a finding that a party waived its contractual right to arbitrate, and "any doubts thereabout must be resolved in favor of arbitration." Ordinarily a party waives its right to arbitrate when it "initially pursues litigation and then reverses course and attempts to arbitrate...." However, waiver "can also result from 'some overt act in Court that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration.' "

*Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476, 484 (5th Cir. 2002) (citations omitted). The Fifth Circuit also requires a showing of material prejudice if waiver is to be found. *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 578 (5th Cir. 1991).

¶104. The procedure to be followed where § 3 is invoked has been carefully and clearly explained by the Fourth Circuit. Section 3 "call[s] for an expeditious and summary hearing, with only restricted inquiry into factual issues." *Glass v. Kidder Peabody & Co.*, 114 F.3d 446, 453 (4th Cir. 1997) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 22). The court presented with a motion to stay under § 3 "must first determine if the issues in dispute meet the standards of either 'substantive arbitrability' or 'procedural arbitrability.'"*Id.* Substantive arbitrability is shown upon the court's finding that (1) a valid arbitration

54

agreement exists and (2) the specific dispute falls within the scope of what the parties agreed to arbitrate." *Id. Cf. Taylor*, 826 So. 2d at 713. Once the court finds affirmatively on these two questions, the dispute *must* then be referred to arbitration. *Id.* All other issues raised before the court not relating to these two determinations fall within the ambit of "procedural arbitrability," which "includes but is not limited to, 'whether grievance procedures or some part of them apply to a particular dispute, **whether such procedures have been followed** or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate.' " 114 F.3d at 453 (quoting *John Wiley*, 376 U.S. at 557) (emphasis added). The Fourth Circuit stated: "It is clear from these decisions, which represent over thirty years of Supreme Court and federal circuit court precedent, that issues of 'substantive arbitrability' are for the court to decide, and questions of 'procedural arbitrability,' as defined in *John Wiley*, are for the arbitrator to decide." *Id.* at 454 (emphasis added). Hence, in reviewing the trial court's order denying a stay in the present case, it is important to keep this distinction clearly in mind.

¶105. The trial court should therefore have confined itself to the issue of substantive arbitrability. Sanderson Farms argues that the underlying dispute in this case is clearly arbitrable pursuant to the Agreement. In fact, the Gatlins admit as much in their complaint, which alleges "wilful and intentional acts and omissions of the Defendant, Sanderson Farms, Inc. constituting **breach of the contract** between the parties" (emphasis added). Further, the arbitration clause of the Agreement clearly says: "**Any controversy or claim** arising between the parties . . ., **including**, but not limited to, disputes relating to this Agreement, or **any breach of this Agreement**, . . . **will be settled by binding arbitration.**" (emphasis added).

55

¶106. The Gatlins' complaint claims breach of contract, and the Agreement says that any claim of breach of the agreement will be settled by binding arbitration. Further, Mr. Gatlin, in effect, admitted that there was a valid arbitration agreement by initiating arbitration proceedings pursuant to the agreement. He only abandoned that pursuit a year later because he allegedly was unable to afford the costs. Thus, the test of substantive arbitrability is met.

¶107. The Gatlins' argument that Sanderson Farms waived or defaulted on[19] any right to enforce the arbitration clause by failing to pay half of the filing fee is procedural, having to do with whether procedures have been followed, as *John Wiley* puts it. The merits of the Gatlins' claim that Sanderson Farms should have paid $1,000 towards the filing fee are simply not before this Court, or any court, in view of the FAA's purpose of expediting arbitration by curtailing judicial involvement.

¶108. In the case sub judice, Sanderson Farms has not actively participated in the lawsuit and has not substantially invoked the litigation machinery. To the contrary, every action taken by Sanderson Farms has been an effort to have the suit dismissed and arbitration compelled. It thus cannot be said that Sanderson Farms has "substantially invok[ed] the litigation machinery." *Mercury Constr. Corp.*, 656 F.2d at 940 (citation omitted).

### C. Is Waiver synonymous with Default?

¶109. Numerous precedents agree that "the proviso in § 3—that a stay shall be granted 'providing the applicant for the stay is not in default in proceeding with such arbitration'—refer[s] to a party 'who, when requested, has refused to go to arbitration or who

---

[19]"Waiver" and "default" are synonyms for purposes of § 3 of the FAA. *Ivax Corp. v. B. Braun of Am., Inc.*, 286 F.3d 1309, 1315 n.17 (11th Cir. 2002).

has refused to proceed with the hearing before the arbitrators once it has commenced,' " or who by "long delay" has waived any right to arbitrate. ***Doctor's Assocs., Inc. v. Distajo***, 66 F.3d 438, 454 (2d Cir. 1995) (quoting ***Kuklundis Shipping Co. v. Amtorg Trading Corp.***, 126 F.2d 978, 989 (2d Cir. 1942)).[20] Waiver is decidable by the courts "where the waiver defense was based on prior litigation by the party seeking arbitration," as opposed to other forms of waiver defenses, which are for the arbitrators to decide. ***Id. Cf. Howsam***, 123 S. Ct. at 592 ("the presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability' "); ***Necchi Sewing Mach. Sales Corp. v. Carl***, 260 F. Supp. 665, 668 (S.D.N.Y. 1966) (distinguishing waiver in terms of delay, which court may decide, from "failure to comply with procedural requirements of the arbitration clause," which arbitrator decides). *See also* ***Dean Witter Reynolds, Inc. v. McDonald***, 758 So. 2d 539, 542-43 & n.4 (Ala. 1999) (following ***Glass*** in distinguishing substantive, court-decided issues from procedural, arbitrator-decided issues; "waiver" due to procedural error not same as "default" under § 3). As we have seen, this Court's decisions in ***Cox***, ***Russell***, and ***Phillips*** are in line with the position of the federal circuits.

---

[20]*See also, e.g.,* ***Gulf Guar.***, 304 F.3d at 486-87 (also noting that § 4 of FAA allows non-obstructive party to seek court order to compel arbitration); ***Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat***, 289 F.3d 434, 438 (6th Cir. 2002); ***Microstrategy, Inc. v. Lauricia***, 268 F.3d 244, 249-50 (4th Cir. 2001) ("the circumstances giving rise to a statutory default are limited and, in light of the federal policy favoring arbitration, are not to be lightly inferred") (citation omitted); ***Morewitz v. W. of England Ship Owners Mut. Prot. & Indem. Ass'n***, 62 F.3d 1356, 1366 (11th Cir. 1995); ***Hoxworth v. Blinder, Robinson & Co.***, 980 F.2d 912, 925-26 (3d Cir. 1992); ***City of Bismarck v. Toltz, King, Duvall, Anderson & Assocs.***, 767 F.2d 429, 432 (8th Cir. 1985) (noting that "procedural objections to arbitration, such as failure to satisfy notice requirements, should be left to the arbitrator").

¶110. I have been unable to find any state or federal case in which a disagreement over the

party to pay fees was held to be a default under § 3.[21]

point held the exact opposite. *Munsey* , 906 P.2d 988, 990 (Wash.

App. 1995). Although the state court in *Munsey*

law, rather than the FAA, it relied on principles identical to those governing the application

The only question, therefore, for the superior court here should have
"whether the parties bound themselves to arbitrate the particular dispute."
And
interpretation of the agreement, the inquiry is at an end and the proper
is for the arbitrator." The court here did more. It necessarily
decided
fee and failure to timely respond to discovery requests
of the arbitration agreement. And, as a sanction it then refused to compel

The agreement provided for payment of the arbitration fee "pursuant to
terms and conditions of payment imposed by [WAMS]." Agreement to
Arbitrate **Those terms and conditions were
by the arbitration agreement, and, accordingly, the arbitrator,
not
been breached and what sanctions, if any, should follow.**
The
had authority here only to compel arbitration. It erred in refusing to do so.

While the district court in *Brownyard v. Maryland Casualty Co.*
(D.S.C. 1994), did hold the company in default where the company had not shared the fees of a
consultant, the prinicipal manifestation of default was the company's complete refusal to

to fail because the company's silence "totally thwarted the purpose and design of the arbitration
forum." at 128. Hence, this default had its basis in the company's delay of proceedings
(prejudicing Brownyard because the company had had time to engage in "comprehensive
*Id.* thus will not stand
for the proposition that a good-faith disagreement over the allocation of fees alone will constitute

*Id.* at 990 (citations omitted).  (Note the similarity of the quoted authorities to those already cited regarding the FAA.)  Because the parties had agreed to arbitrate *all* their disputes, including therefore those arising from the arbitration agreement, procedural questions of who pays what when, were reserved for the arbitrator to decide.

¶111.  Prejudicial delay, as this Court has stated, can waive the right to arbitrate.  *See Cox*, 619 So. 2d at 913-14 . *But see Gulf Guar.*, 304 F.3d at 484 ("mere delay falls far short of the waiver requirements").  Had Sanderson Farms simply refused to pay for arbitration, so that the proceedings were stalled indefinitely, that presumably would have at some point sufficed for a default.  However, Gatlin went ahead and paid the disputed fee, apparently with the expectation that the arbitrator could ultimately decide that issue as well.

¶112. As I have already noted, the plain language of the Agreement states:  "**Any** controversy or claim arising between the parties . . ., including, but not limited to, disputes relating to this Agreement, or **any breach of this Agreement**, . . . **will be settled by binding arbitration**." (emphasis added).  Merely showing a breach does not suffice to void the arbitration agreement.  The standard instead is that enunciated above as constituting a default under 9 U.S.C. § 3.  To hold that a dispute over who pays which fees, or some other procedural dispute, was inconsistent with the right to arbitrate and thus a default, would make nonsense of the U.S. Supreme Court's distinction between procedural and substantive issues.  In *Howsam*, the party seeking arbitration was argued to have been doing so after the six-year time limit set by the arbitration agreement, yet the merits of that issue were held to be for the arbitrator, and the Court did not even *consider* the notion that by arguably breaching the arbitration agreement's terms, the party was in default.  *Howsam*, 123 S. Ct.

at 590 & 593.  Analytically, that issue does not materially differ from the fee issue raised today by the Gatlins.  If the arbitration agreement provides for a time limit, or for the parties to split some fees, or for the parties to wear full evening dress at the arbitration hearing, failures to comply with those rules may well result in the arbitrator's finding that a party has waived its right to arbitrate by failing to follow the rules—*but that determination is left to the arbitrator, not to the courts.*  For courts to decide the merits of such issues would undo the *fundamental premise of arbitration*, which is that where the parties have agreed to arbitrate a dispute, the courts' attitude to the entirety of that dispute should be "hands off."

¶113.  For Gatlin to show that the alleged breach by Sanderson Farms rose to the level of a default, he would have to show that Sanderson Farms acted in a manner inconsistent with the very right to arbitrate which it sought to enforce.  As the U.S. Supreme Court's decision in **Howsam** implies, any procedural error by Sanderson Farms made a procedural error by in not splitting the filing fee with Mr. Gatlin, is the kind of question that is itself left to the arbitrator to decide, not an act inconsistent with the right to arbitrate.  The plurality fails to cite any authority in favor of determining otherwise.

¶114.  " 'There is a strong presumption against' a finding that a party waived its contractual right to arbitrate, and **'any doubts thereabout must be resolved in favor of arbitration**.' " *Gulf Guar.*, 304 F.3d at 484 (quoting *Texaco Exploration & Prod. Co. v. AmClyde Engineered Prods. Co.*, 243 F.3d 906, 911 (5th Cir. 2001)) (emphasis added); *see Russell*, 826 So. 2d at 724 ("**[w]aiver of arbitration is not a favored finding, and there is a presumption against it**") (quoting *Miller Brewing Co. v. Fort Worth Distrib. Co.*, 781 F.2d 494, 497 (5th Cir. 1986)) (emphasis added); *Taylor*, 826 So. 2d at 713 ("**as a matter of**

**federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration**, whether the problem at hand is the construction of the contract language itself or an **allegation of waiver**, delay, or a like defense to arbitrability") (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25 (emphasis added)).

¶115. Therefore, under federal and Mississippi precedents, I would hold that no showing of default was made that would justify the circuit court's order. The circuit court exceeded its proper jurisdiction in ruling on the breach of contract claim. I would reverse on the issue appealed by Sanderson Farms.

¶116. One of the "real benefits to the enforcement of arbitration provisions" is supposed to be "avoid[ing] the costs of litigation." *Adams*, 532 U.S. at 124. That benefit diminishes drastically when arbitration costs soar into the tens of thousands of dollars. And when those costs have the pernicious effect of extinguishing a party's right to legal redress, they become not merely exorbitant but unconscionable. The apparent substantive unconscionability of the Agreement, in view of the thousands of dollars which Gatlin seemingly must pay simply to obtain a hearing, necessitates remand to the trial court for necessary findings of fact. The other issues raised by the Gatlins may well be meritorious, but as I have demonstrated, the law of arbitration requires that the arbitrator, not the courts, weigh those merits. I am not unmindful that, by following the established precedents stated herein, a final resolution of this case cannot be reached by this Court today, which would surely be the desire of all parties. However, as we blaze this trail through the jungle known as "arbitration", it is imperative that we do so deliberately, and with meticulous attention to detail, lest we unintentionally complicate or unknowingly contradict established law.

Therefore, and for all the reasons stated herein, I would reverse and remand to the County Circuit Court, Second Judicial District, for further proceedings in accordance with waiver of fees from the AAA, while retaining jurisdiction over the case. Upon the AAA's making its finding regarding hardship, the circuit court should then conduct a hearing to whether Mr. Gatlin's financial situation prevents him from affording the arbitration stage to support the position that Mr. Gatlin is able to bear the cost of arbitration.) If the court determines that the arbitration costs remain unconscionable, it should then apply the Agreement's severability clause to strike the arbitration clause from the Agreement.

**SMITH, P.J., AND CARLSON, J., JOIN THIS OPINION.**